(Nos. 72099, 72100 cons.—

BALMORAL RACING CLUB, INC., *et al.*, Appellants, v. THE ILLINOIS RACING BOARD *et al.*, Appellees.

*Opinion filed September 24, 1992.—Rehearing denied November 30, 1992.*

368

Arthur E. Engelland and Angela M. Riccio, of Chicago, for appellant Chicago Division of the Horsemen's Benevolent and Protective Association.

Jeremiah Marsh, William J. McKenna, Jr., E. Glenn Ripple and Robert R. Hall, Jr., of Hopkins & Sutter, of Chicago, and Thomas Feehan, of Rooks, Pitts & Poust, of Joliet, for appellant Balmoral Racing Club, Inc.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, Paula Giroux, Assistant Attorney General, and Gary L. Starkman and Joseph J. Sinopoli, Special Assistant Attorneys General, of Chicago, of counsel), for appellee Illinois Racing Board.

Dan K. Webb, Scott J. Szala, Frank H. Langrock and Darcy J. Bogenrief, of Winston & Strawn, of Chicago, for appellees Arlington Park Racetrack, Ltd. *et al.*

Robrt K. Bush, of Ancel, Glink, Diamond & Cope, P.C., of Chicago, for *amicus curiae* South Suburban Mayors and Managers Association.

Thomas J. Gilbert, of Gilbert & Schoenstedt, of Joliet, for *amici curiae* Egyptian Trotting Association, Inc. *et al.*

Thomas A. Clancy and Dennis A. Rendleman, of Springfield, for *amicus curiae* Illinois State Bar Association.

JUSTICE CUNNINGHAM delivered the opinion of the court:

Appellants in this case, Balmoral Racing Club, Inc. (Balmoral), and Chicago Division of the Horsemen's Benevolent and Protective Association, Inc. (the Horsemen's Association), separately initiated this action against numerous defendants to contest a decision rendered by the Illinois Racing Board (Board) pursuant to the Board's 1991 dates hearing. Their cases were consolidated for purposes of this appeal.

The decision of the Board denied Balmoral's request for thoroughbred racing dates in 1991. The circuit court of Will County reversed the decision of the Board and awarded Balmoral 62 thoroughbred racing dates during the summer of 1991. The appellate court reversed the decision of the circuit court. (214 Ill. App. 3d 112.) We granted Balmoral's petition for leave to appeal to this court (134 Ill. 2d R. 315). In the instant case, we reverse the judgments of the appellate and circuit courts, and remand this cause to the circuit court for action consistent with this opinion.

Before reviewing the facts giving rise to this action, it is helpful to address the identity of the parties involved. Balmoral is an organization whose principal place of business is Balmoral Park, located in Crete, Illinois. Balmoral is in the business of conducting horse races. The Horsemen's Association is a not-for-profit organiza-

tion whose membership is comprised of owners or trainers of thoroughbred racehorses licensed to race in the United States or Puerto Rico.

The defendants were numerous and consisted of all participants in the 1991 dates hearing conducted by the Board. However, for purposes of this appeal, only Arlington Park Racetrack, Ltd., d/b/a Arlington International Racecourse, Ltd., and Washington Park Thoroughbred Racetrack, Ltd. (collectively, Arlington), and the Illinois Racing Board remain as appellees. (Hawthorne Race Course, Inc. (Hawthorne), did file a motion to dismiss this appeal due to mootness and did participate in the proceedings before the appellate court. However, in this action, Hawthorne did not file a response to Balmoral's petition for leave to appeal, did not brief any of the issues and did not participate in oral argument. For all intents and purposes, Hawthorne is no longer a party to this appeal.)

The Board is an administrative agency whose actions are authorized and restricted by the Illinois Horse Racing Act of 1975 (the Racing Act) (Ill. Rev. Stat. 1989, ch. 8, par. 37—1 *et seq.*). The Board is responsible for executing the mandates of this act, including assigning horse racing dates to the various racing entities requesting such and regulating the horse racing industry of Illinois.

The remaining defendants-appellees are entities responsible for conducting horse racing meetings in the State of Illinois. The principal place of business of the Arlington defendants is Arlington Racetrack, which is located in Cook County.

## THE 1991 RACING DATES HEARING

The parties convened in Chicago on September 18, 1990, for purposes of conducting the 1991 dates hearing. During this meeting, racing dates to conduct thorough-

bred and harness races in 1991 were to be assigned to various racing entities. The parties had been required to submit applications for racing dates to the Board no later than the end of August. These applications were ostensibly used to assist the Board in the award of racing dates.

In its application, Arlington requested dates for summer thoroughbred racing. Balmoral requested dates be awarded to it to conduct its own thoroughbred race meet during overlapping summer months. Balmoral also requested dates to hold harness races at Balmoral racetrack at other times of the year.

At 6 a.m. on September 18, 1990, the Board posted a proposed schedule of racing dates for 1991 along with a preliminary statement. This schedule did not include any thoroughbred racing dates to be conducted at Balmoral Park and instead awarded year-long harness racing to be conducted at the Balmoral track. A year-long harness racing meet was not requested by Balmoral.

The meeting began later that morning with the Board chairman reading the preliminary statement which was posted at 6 a.m. After disposing of preliminary matters, the Board invited representatives from various horsemen's associations to speak. The first speaker was a representative from the Horsemen's Association. The Horsemen's Association indicated a preference for racing at Balmoral, as Balmoral had exhibited a greater commitment to Illinois thoroughbred racing than had Arlington.

After several more speakers, the Board proceeded to admit into evidence, among other things, past dates orders establishing racing dates from as early as 1985, annual reports of the Board from the last five years, and an evidentiary submission from Balmoral. Additional evidence was presented to the Board and admitted into the record as the hearing progressed. This included admit-

ting all the applications received from those requesting racing dates.

After admitting this evidence, the chairman asked a representative from each racing entity to address the Board's proposed schedule. The representatives were "sworn in" and their sworn statements became part of the record.

One of the first speakers was a representative from Arlington International Racecourse. Arlington indicated its willingness to accept the dates which the Board had assigned to it and the conditions which the Board had imposed upon Arlington. The Arlington representative then addressed the concerns expressed by the Horsemen's Association and indicated that it was Arlington's intention to provide racing opportunities for many Illinois horses, owners and trainers. The Board asked several more questions of the Arlington representative; the representative's answers all indicated Arlington's commitment to ensuring excellence in racing and providing quality horse races and its dedication to Illinois racing.

During the testimony provided by Arlington, the Board noted it had received a six-page statement from the representative and asked if the racetrack would like to have this statement made part of the record. The representative responded affirmatively. This unsigned and unsworn statement alleges that contemporaneous races held at Balmoral the previous year had harmed Arlington revenues and races.

After testimony from Fairmount Park was presented, the representative from Hawthorne Race Course was asked to speak. The representative expressed consternation over the fact that Hawthorne was given the fewest number of days of racing, was given dates to race during the winter months, the "worst time of the year," and was given the fewest wagering opportunities. The representative exclaimed that the assignment of dates

was not "fair." An amendment to the racing schedule was proposed by the representative which would give Hawthorne additional racing opportunities during better racing times.

The next speakers were representatives from Balmoral, who expressed their dissatisfaction with the proposed schedule, maintaining that the schedule as proposed would reduce its income by as much as one-third and would ultimately decrease State revenue. In rendering this opinion, the Balmoral representative stated, "I cannot believe that we are put in the position of fighting for our thoroughbred life without warning." Balmoral also addressed the issue of "short fields" (not having enough eligible horses to run particular races at certain tracks). The Balmoral representative contended that the problem of "short fields" was not caused by running races on the same days at both Balmoral and Arlington, as was suggested during the meeting, but was rather the product of a number of other factors beyond Balmoral's control, including the strict eligibility requirements which Arlington placed upon horses before they were allowed to participate in a particular race. The representative also addressed the reasons Arlington's handle was down the year before, presenting numerous reasons which, it was alleged, had all been previously noted by Arlington or other entities. ("Handle," in the racing industry, is generally recognized as referring to the total amount of money wagered.) Balmoral concluded that none of these reasons could be attributed to contemporaneous Balmoral race meets.

During their presentation, the Balmoral representatives indicated that they had become suspicious that the Board would deny Balmoral summer thoroughbred racing dates. Therefore, before the meeting had taken place, Balmoral requested of the Board a copy of Arlington's application for racing dates. Balmoral asserted that

this application would enable it to prepare responses to any contentions raised by Arlington that Balmoral should not receive thoroughbred dates. Balmoral testified that it had been shown the applications before the dates hearing in the past. However, on this occasion, the representatives were denied access to Arlington's application. Therefore, Balmoral asserted, it could not affirmatively refute any arguments made by Arlington against awarding Balmoral racing dates.

The Board discussed this and, noting that the applications had been admitted into the record, determined to make a copy of Arlington's application available to Balmoral. It further acknowledged that the Board representative's failure to allow Balmoral to view this application before the meeting was an inadvertent error. The Board determined, however, that it would have to remove confidential information from the application.

Balmoral was later supplied a redacted copy of Arlington's application, which omitted certain "proprietary information" about Arlington, and was given an opportunity to review this document. In this redacted copy, the Board had deleted the addresses of various Arlington officers and removed certain financial information about the owners.

The Board further notified Balmoral that it had, at the last year's meeting, requested that evidentiary submissions in support of each application be turned over at the end of August, along with the application. The Board indicated that Balmoral had not submitted its evidentiary exhibits until the day before the meeting. Balmoral noted that it did not remember this request but would attempt to comply with the rule in the future.

Balmoral then addressed its request for harness dates. Other entities requesting harness dates were also asked to speak. The speaker from Sportsman's Harness Board noted that the proposed schedule, while losing

thoroughbred competition, increased competition for Sportsman's Harness, thereby hurting that harness meet.

After a lunch break, the meeting was reconvened and the representative from Arlington was recalled to provide additional testimony. The representative was asked to give his opinion on the value of "exclusivity" to the horse racing market and, further, whether allowing Balmoral to run thoroughbred races while Arlington is conducting its own thoroughbred race meetings harms Arlington. The Arlington representative responded that exclusivity is the most important thing that could happen for the future of Arlington and Illinois racing. Arlington also addressed the shortage-of-horses issue and indicated that in 1990, when Balmoral was conducting a concurrent race schedule, there had been an average of 7.6 horses per race in the field, compared to 8.7 horses the year before, when Arlington did not have competition from Balmoral, and alleged that this reduction in horses significantly negatively affected wagering at Arlington, decreasing revenues.

While acknowledging agreement with Arlington's comments, one Board member stated:

> "And personally, you know, Mr. Duffy, it's my opinion that Arlington Park has the greatest racing facility in the entire world.
>
> I have been to almost every major racing facility in this country and in many foreign countries and I feel definitely that Arlington has the best facility in the entire world.
>
> * * *
>
> So I believe personally that Arlington does deserve a chance to really succeed.
>
> I am a proponent not only this year but in prior years of the exclusivity of thoroughbred dates."

One of the questions asked of the Arlington representative was: "If we grant market exclusivity to Arlington will we be maximizing revenue [to] the State of Illinois all other things being equal?" The Arlington representative replied, "In my opinion you absolutely will," and explained that Arlington, being located in Cook County, pays higher taxes to the State on racing revenue than Balmoral does. In essence, therefore, Arlington must make half as much revenue as Balmoral in order to earn the State the same amount of money.

The Board then asked Balmoral if it had had an opportunity to review Arlington's application. Balmoral stated that the application did not provide any evidence that Balmoral had harmed Arlington. Balmoral was also given the six-page statement made by Duffy, the Arlington representative, which discusses the harm which competition from Balmoral had allegedly caused Arlington. The representative expressed that there were problems with the statistics presented but felt Balmoral had not been given enough time to review the document and to prepare an adequate rebuttal to the contentions raised, although he could indicate that he felt that some of the statistics were in error. Balmoral repeated that harness racing does not generate as much handle as thoroughbred racing and that this will affect State revenue. The Board agreed that harness handle would mean less revenue for Balmoral but disagreed that awarding harness to Balmoral would negatively affect State revenue.

After the close of the Balmoral testimony, the Board suggested amendments to the schedule, based upon the testimony it had heard. Those amendments did not include Balmoral thoroughbred racing dates. A vote was taken on these modifications; they were unanimously affirmed and the meeting was soon after adjourned.

## PROCEDURAL HISTORY

On October 4, 1990, Balmoral and the Horsemen's Association filed a complaint in the circuit court of Will County seeking review of the Board's actions at the 1991 dates hearing.

On October 16, 1990, the Board entered its order assigning racing dates to various entities. This order was based upon the results of the September 18 dates hearing (the order). Pursuant to the Racing Act, the order specified distances between various racing parks in upstate Illinois. (Ill. Rev. Stat. 1991, ch. 8, par. 37—19(a)(1).) The Illinois Department of Transportation certified to the Board that the mileage between Arlington International Race Course and Balmoral Park is 63.6 miles. The order also noted that each applicant had filed with the Board an affirmative action plan, outlining plans to recruit, train and upgrade minorities.

The Board then proceeded to award thoroughbred racing dates. The thoroughbred dates were awarded as follows:

(1) from February 19 to May 11, races to be held at Sportsman's Park;

(2) from May 12 to October 9, races to be held at Arlington Racecourse;

(3) from October 10 to December 30, races to be held at Hawthorne Race Course.

All of these tracks are located in Cook County. The harness schedule was also presented. Harness dates were scheduled to be run by Balmoral at Balmoral Park from January 1, 1991, to June 2, 1991, with races to be run at Balmoral Park for the remainder of the year by Balmoral Park Trot, a tenant of the racetrack. Harness dates were also scheduled to be run at Sportsman's Park and Hawthorne Race Course during this same period.

The day after this order was published, an amended complaint was filed by Balmoral and the Horsemen's Association. On February 27, 1991, after extensive hearings, the circuit court rendered a decision in favor of Balmoral. In its order, the circuit court awarded 62 thoroughbred racing dates for 1991 (between May 12, 1991, and December 30, 1991) to Balmoral to be run on consecutive Sunday evenings, Mondays and Tuesdays.

As stated by the circuit court, the sole issue before it was whether the 1991 dates order issued by the Board was contrary to law or against the manifest weight of the evidence. The court found that the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1991, ch. 127, par. 1001 *et seq.*) applied to the Board's proceedings, that the Board had failed to comply with the requirements of various provisions of this act and that much of the Board's order was against the manifest weight of the evidence.

A motion to vacate or reconsider portions of the judgment was filed by Arlington and the Board on March 7, 1991. In response to certain comments of the circuit court in rendering its opinion, the affidavit of Cecil Troy, a member of the Board, was attached to this motion. This affidavit outlined the various procedures adopted by the Board in conducting the date hearings. The motion to vacate was denied.

The decision of the circuit court was then appealed to the appellate court by Arlington, the Board and Hawthorne. The parties sought to have the judgment of the circuit court reversed or reversed and remanded.

In an opinion filed May 30, 1991, the appellate court reversed the circuit court decision and denied Balmoral thoroughbred racing dates. The appellate court also held that the Administrative Procedure Act did not apply to the proceedings of the Board. 214 Ill. App. 3d 112.

Balmoral sought leave to appeal this decision to this court. The Horsemen's Association filed a separate petition for leave to appeal this judgment. Allowing both parties to appeal, this court ordered that Balmoral's cause be consolidated with that of the Horsemen's Association.

The parties to this action raise a number of issues addressing the procedural propriety of the 1991 dates hearing and whether, at this late date, the issue of 1991 racing dates is moot. Supporting Balmoral, as *amicus,* is the Illinois State Bar Association, which strenuously argues for the application of the Administrative Procedure Act to the hearings of the Board.

## ANALYSIS

Balmoral raises several issues in its argument addressing the procedural propriety of the dates hearing which denied it thoroughbred racing dates. These issues include (1) whether the Racing Act requires the Board to consider the five factors presented in section 21(c) of the Racing Act (Ill. Rev. Stat. 1991, ch. 8, par. 37—21(c)) in evaluating each application before it; (2) whether the provisions of the Administrative Procedure Act (Ill. Rev. Stat. 1991, ch. 127, par. 1001 *et seq.*) apply to the racing dates hearings; and (3) whether Balmoral was denied due process during the 1991 dates hearing. However, before proceeding to a resolution of the issues raised in this dispute, we must first address Hawthorne's contention that this appeal is moot.

We note, preliminarily, that allegations are asserted throughout the briefs that the parties' arguments have been raised for the first time before this court. Despite these allegations, we have decided to address all the issues, because, in part, of the likelihood of a recurrence of these matters. See *E & E Hauling, Inc. v. Pollution Control Board* (1985), 107 Ill. 2d 33, 39.

## Mootness

In a motion filed on January 16, 1992, Hawthorne contended that because this appeal involved the question of whether the Board's procedure in awarding its 1991 racing dates was invalid and because 1991 had already concluded, there were no justiciable issues remaining for which this court could grant relief. This motion was to be decided with this case.

Despite its failure to join this case as appellee, Hawthorne filed this motion to dismiss due to mootness. Because Hawthorne is not really an active party to this appeal, we do not feel compelled to address this motion. However, because mootness issues are important in that this court can address only justiciable issues, we feel we should address this motion. We conclude now that the action is not moot.

Balmoral and the Horsemen's Association (as the parties have filed a joint brief, they will hereinafter be referred to collectively as Balmoral) objected to Hawthorne's motion, arguing that the action was not moot, because, despite the fact that the denial of thoroughbred racing dates precipitated this action, Balmoral is seeking more than an award of 1991 dates. It is also seeking a determination that its procedural rights were violated in the Board's denying its application for racing dates.

In the alternative, Balmoral argues that this case falls within one of the exceptions to mootness which this court has previously recognized. Balmoral seeks to have us find that this case (1) presents issues capable of repetition yet evading review, and (2) this case raises issues of substantial public interest. We now hold that this appeal is not moot and therefore we need not address whether one of these exceptions apply.

A case becomes moot where the issues raised in and decided by the trial court no longer exist because events have occurred since filing of the appeal which make it impossible for the reviewing court to render effectual relief. (*In re A Minor* (1989), 127 Ill. 2d 247, 255.) Where a decision reached on the merits cannot result in appropriate relief to the prevailing party, the court has, in effect, rendered an advisory opinion. (*George W. Kennedy Construction Co. v. City of Chicago* (1986), 112 Ill. 2d 70, 76.) We do not review cases merely to guide future litigation or to set precedent. *Madison Park Bank v. Zagel* (1982), 91 Ill. 2d 231, 235.

However, this court has noted there may be life in an appeal where a "decision could have a direct impact on the rights and duties of the parties." (*People ex rel. Bernardi v. City of Highland Park* (1988), 121 Ill. 2d 1, 6-7.) The court further recognized in that case that, where a decision rendered by this court will have " 'important consequences' " for the parties involved in the appeal, it is proper for this court to entertain the appeal. *Bernardi*, 121 Ill. 2d at 7, quoting *People v. Lynn* (1984), 102 Ill. 2d 267, 273.

The dates order was filed in October of 1990. In 1991, the trial court entered its order which awarded to Balmoral 1991 racing dates. Despite expedited briefing schedules in the circuit and appellate courts, this appeal did not reach this court until January 1992, after the time for which 1991 racing dates could be run had expired. Were we to be solely concerned with the award to Balmoral of racing dates and were that the only relief which we could grant, this appeal would be moot.

However, a decision in this case regarding whether the Board's procedures were inadequate to protect the rights of Balmoral and other racing participants could have "important consequences" for all the parties involved. A determination that the Board's procedures

were deficient could mean that the Board must undergo significant changes in the conduct of its race meetings. A contrary determination could allow the Board to continue to deprive Balmoral of its thoroughbred racing license, thereby perhaps affecting Balmoral's bottom-line revenue, the local economy and the revenue which it gives to the State.

Further, a determination that the Board violated Balmoral's rights through the procedure adopted could also have significant monetary consequences for the parties. Should the Board's procedures be held to have violated the Administrative Procedure Act, Balmoral and the Horsemen's Association may seek an award of costs and fees, pursuant to Illinois statute. Ill. Rev. Stat. 1991, ch. 127, par. 1014.1(b).

Hawthorne's motion for dismissal due to mootness of the issues brings to our attention two cases: *Maywood Park Trotting Association, Inc. v. Illinois Harness Racing Comm'n* (1959), 15 Ill. 2d 559, and *National Jockey Club v. Illinois Racing Comm'n* (1936), 364 Ill. 630. These cases were brought to decide matters of applications for racing dates brought before racing boards. However, the cases set forth by Hawthorne are outdated and we decline to follow their precedent where important considerations outside of the award of racing dates exist. These cases never discussed these other important considerations.

We therefore conclude that this appeal is not moot. We turn now to the issues raised by Balmoral, alleging procedural deficiencies in the Board's 1991 dates hearing.

## The Racing Act

Initially, Balmoral attacks the Board's interpretation and application of the Illinois Racing Act (Ill. Rev. Stat. 1991, ch. 8, par. 37—1 *et seq.*), contending that the

Board's application to Balmoral of the factors set forth in section 21(c) (Ill. Rev. Stat. 1991, ch. 8, par. 37—21(c)) is error because Balmoral is more than 35 miles from any other track.

Section 21(c) reads as follows:

"(c) Where two or more applicants propose to conduct horse race meetings within 35 miles of each other, as certified to the Board under Section 19(a)(1) of this Act, on conflicting dates, the Board may determine and grant the number of racing days to be allotted to the several applicants. In the granting of organization licenses and in allocating dates for horse race meetings which will, in its judgment, be conducive to the best interests of the public and the sport of horse racing, the Board shall give consideration to an agreement among organizations, as provided in subsection (b) of Section 21 of this Act, and also shall give due consideration to:

(1) the character, reputation, experience and financial integrity of the applicants and of any other or separate person that either:

(i) controls, directly or indirectly, such applicant, or

(ii) is controlled, directly or indirectly, by such applicant or by a person which controls, directly or indirectly, such applicant;

(2) their facilities and accommodations for the conduct of horse race meetings;

(3) the location of the tracks of the applicants in relation to the principal centers of population of the State;

(4) the highest prospective total revenue to be derived by the State from the conduct of such meets;

(5) the good faith affirmative action plan of each applicant to recruit, train and upgrade minorities in all classifications within the association." Ill. Rev. Stat. 1991, ch. 8, par. 37—21(c).

In understanding Balmoral's argument, it is useful to note that section 19(a)(1) of the Racing Act disallows the award of concurrent racing dates to tracks located within 35 miles of one another. (Ill. Rev. Stat. 1989, ch. 8, par. 37—19(a)(1).) Balmoral concludes that no conflict

exists where two tracks located more than 35 miles apart apply for competing dates and argues that, because section 21(c) begins with a reference to tracks located within 35 miles, those factors listed in the second sentence of section 21(c) are only to be applied when tracks within 35 miles of each other apply for conflicting racing dates. We disagree, holding that the section 21(c) factors should be applied whenever evaluating applications for racing dates.

This court has consistently held that the starting place in interpreting the meaning of a statute is to ascertain and give effect to the legislative intent in enacting the statute. (See, *e.g., Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54, 96; *People v. Madison* (1988), 121 Ill. 2d 195, 200.) " 'This is to be done primarily from a consideration of the legislative language itself, which affords the best means of its [the statute's] exposition ***.' " (*Maloney v. Bower* (1986), 113 Ill. 2d 473, 479, quoting *Franzese v. Trinko* (1977), 66 Ill. 2d 136, 139.) We are also mindful that "[w]e should not attempt to read the statute other than in the manner in which it was written." *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund* (1983), 95 Ill. 2d 211, 215.

We thus turn to the language of the statute to begin our analysis of the meaning of section 21(c). The statute clearly states: "In the granting of organization licenses and in allocating dates for horse race meetings which will, in its judgment, be conducive to the best interests of the public and the sport of horse racing," the Board shall give consideration to five factors. There is no limitation placed in this sentence that the five factors are only to be considered if the tracks are located within 35 miles from one another.

This sentence further makes reference to section 21(b) of the Racing Act, which provides a general grant

of discretion to the Board in awarding racing dates. Section 21(b) does not contain a 35-mile limitation in the award of racing dates. As section 21(c) refers to this general grant of discretion, we must conclude that section 21(c) was meant to guide the exercise of the Board's general discretion.

When the legislature vests discretionary authority within an administrative agency, "intelligible standards must be provided to guide the officer in the exercise of his discretion." (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 551.) Failure to determine such standards renders the statute void. *Krol v. County of Will* (1968), 38 Ill. 2d 587, 593.

An examination of the legislative history confirms our interpretation. This court has noted that where a statute is susceptible of different interpretations, it is proper to examine things other than the plain language of the statute. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 279.) In these instances, courts often turn to the legislative history of the statute. *People v. Boykin* (1983), 94 Ill. 2d 138, 141.

The legislative history of this act supports the conclusion we have reached. In 1984, the legislature proposed to amend section 21(c). Originally, the Act created a conflict in the award of racing dates where tracks within *45* miles of each other requested the same racing dates be awarded them. The amendment sought to have this mileage reduced to the current 35-mile limitation.

During the Senate debates when the bill was presented, upon questioning concerning the reasons for reducing the limitation to 35 miles, Senator Phillip Rock addressed the Assembly and noted:

"As you well know, I am probably as friendly to the people who own and ... and run Sportsman's Park as anybody in the Chamber, but I really believe, given the fact that Balmoral Race Track and all the parimutuel employ-

ees and all the concessionaires and their employees and ... and the ... I ... I think they ought to have a chance. Now we can't grant them that chance because we can't, under our law, dictate to the Illinois Racing Board the awarding of dates or times or any of that stuff, that's up to them. All we are ... we are doing is affording the racing board that opportunity. If they don't want to do it, they don't have to do it, but we are not prohibiting it by law and I think that's a fair chance ***." 83d Ill. Gen. Assem., Senate Proceedings, June 28, 1984, at 202-03.

The Senate debate indicates that the Senate never meant to remove from the Board the discretion which it had originally been granted. The Senator expressly noted that the Senate would not be prohibiting the award of racing dates to Balmoral based upon the mileage requirement in resolving conflicts but it would also not mandate the award of racing dates to any entity outside of the 35-mile limitation.

Therefore, based upon plain language and legislative history, we conclude that section 21(c) is meant to guide the exercise of the Board's general discretion whenever reviewing any application for horse racing dates. The factors of section 21(c) should be applied regardless of distance between tracks.

Balmoral disagrees with this conclusion and instead sets forth several arguments in support of its position. These arguments ignore the plain language of section 21(c) and the legislative history in enacting it. We shall, however, address those issues of substance which Balmoral raises.

The first of these arguments is that certain provisions of the Racing Act itself require us to read section 21(c) as Balmoral suggests. First, Balmoral states that provisions of the Racing Act, most particularly sections 19(a)(1) through 19(a)(5) (Ill. Rev. Stat. 1991, ch. 8, pars. 37—19(a)(1) through (a)(5)), establish standards to guide the Board in awarding racing dates. Therefore, Balmoral

argues that, as these provisions already supply standards, to read section 21(c) as we now do would render these provisions superfluous. However, none of these provisions establishes a standard for determining the award of racing dates, as does section 21(c). Particularly, section 19 merely deals with minimal requirements for delineating to whom a license may be granted. Further, these requirements do not duplicate the requirements set forth in section 21(c), as Balmoral suggests.

Balmoral's second argument asserts that a construction which requires the application of the section 21(c) factors to every racetrack would unfairly discriminate against non-Cook County tracks. Because the Racing Act establishes a graduated tax system whereby tracks located in a county of less than 400,000 individuals pay a different tax than do tracks located in a county with more than 400,000 inhabitants, non-Cook County tracks will always generate less State revenue. Therefore, the argument continues, the Board will always favor Cook County tracks.

This argument elevates one factor in section 21(c), the maximization of State revenue, above the remaining four factors. There is no indication that the legislature meant for this result. Furthermore, to adopt Balmoral's theory would mean adopting the theory that the Board is *required* to award exclusive dates and may not *consider* awarding concurrent race schedules to tracks located more than 35 miles from each other.

Despite the arguments raised by Balmoral and the Horsemen's Association, we conclude that the award of racing dates, regardless of distance between tracks, remains within the Board's discretion. The Board's discretion is limited by the requirements set forth in section 21(c). Through consideration of these factors, the Board may elect to award concurrent racing dates to tracks lo-

cated more than 35 miles apart, but is not required to do so.

However, the Board is required to consider all five factors presented in section 21(c) when making this decision. This the Board did not do. Rather, the 1991 dates order indicates that the Board focused exclusively upon one factor: the maximization of State revenue. Ill. Rev. Stat. 1991, ch. 8, par. 37—21(c)(4).

In providing a racing schedule which presented "the Board's best effort to fulfill its obligation to maximize State revenue while discharging its obligation to Illinois horsemen," the Board's order read, in pertinent part, as follows:

"In the 1990 Dates Order, the Board found that the 1989 race meeting at Arlington International Racecourse 'was an unprecedented success, setting new Illinois records for handle and attendance.' That meet was unopposed by any other Chicago-area thoroughbred race meeting. During the same year, the thoroughbred race meeting conducted at Sportsman's Park was opposed by a thoroughbred race meeting at Balmoral Park. It was evident that, during the spring of 1989, the thoroughbred horse population was insufficient to support both of these race meetings. The thoroughbred race meetings at Hawthorne Race Course were unopposed during most of 1989 and all of 1990. For calendar year 1990 the Board eliminated thoroughbred competition between Sportsman's Park and Balmoral Park but allowed Balmoral to conduct thoroughbred racing two (2) days per week opposite the race meeting conducted at Arlington International Racecourse. This experiment clearly benefited the thoroughbred race meeting at Sportsman's Park but again resulted in an insufficient horse population for concurrent race meetings at Arlington and Balmoral. Like Sportsman's 1989 meet, Arlington's 1990 meet has been plagued by short fields which have caused a decline in attendance and handle. It is uncontested that the fewer the number of betting interests in a race, the fewer the num-

ber of dollars that will be bet on that race. The supply of available horses for Illinois thoroughbred racing has been further reduced in recent years by the operation of thoroughbred racetracks in Minnesota, Oklahoma, Iowa and the summer thoroughbred meets at Churchill Downs in Kentucky.

The experience of the last two racing years demonstrates a vital need for unopposed race meetings at the three principal Chicago thoroughbred racetracks—Sportsman's Park, Arlington International Racecourse and Hawthorne Race Course. *In the exercise of our obligation to maximize state revenue,* we conclude that such exclusivity will have a positive affect [*sic*] on state revenue and, at the same time, will not negatively impact those horsemen who have regularly participated in thoroughbred race meetings at Balmoral Park.

Representatives of Balmoral presented a cogent and forceful argument with respect to its desire to retain thoroughbred dates in competition with Arlington. For purposes of this order, we accept Balmoral's entire factual statements as accurate, but, nonetheless, are *required to exercise our discretion in favor of a schedule that provides the greatest financial return to the state treasury. In our judgment, market exclusivity will best accomplish that objective.*" (Emphasis added.)

Despite this language, the appellate court held that the Board impliedly considered all five factors. (214 Ill. App. 3d at 118.) This holding is error. The appellate court reasoned that evidence to make a determination about all five factors was possibly present in the record. It is the opinion of this court that the mere fact that the record might contain such evidence is not an indication that the Board has *considered* the evidence, as required by the statute. (Ill. Rev. Stat. 1991, ch. 8, par. 37–21(c).) This conclusion is bolstered by the fact that the Board's own language repeatedly states that its duty is to exercise its discretion to maximize State revenue. The

exercise of this duty apparently, by the Board's own order, excludes consideration of the additional four factors.

We recognize, as Arlington points out, that we previously emphasized the maximization of State revenue in *People ex rel. Scott v. Illinois Racing Board* (1973), 54 Ill. 2d 569. In that case, this court stated, "A primary legislative purpose in the regulation of horse racing is the generation of income for the State ***. *** The strong public interest in maximizing both revenue to the State and to public charities is apparent, as is the necessity of requiring strict observance *** of these objectives." (*Scott*, 54 Ill. 2d at 576.) At no point, however, did this court state that this factor was more important than the other factors presented in the Racing Act.

It is our holding today that the Board must consider all five factors listed in section 21(c) when awarding racing dates. There is no evidence in this record that the Board exercised its discretion in the award of 1991 dates so as to do precisely what the statute requires. For purposes of due process, these findings should be made evident in the Board's dates orders.

In considering section 21(c)(4), the Board should take into consideration all the revenue generated by a particular racing establishment. Section 21(c)(4) states that the Board is to consider "the highest prospective total revenue to be derived by the State from the conduct of such meets." (Ill. Rev. Stat. 1991, ch. 8, par. 37—21(c)(4).) There is no restriction placed in the statute that only handle tax should be considered. Therefore, among other things, the Board should consider any sales taxes, income taxes and admission taxes which might apply.

### Administrative Procedure Act

The second issue raised by Balmoral concerns the applicability of the Administrative Procedure Act (Ill. Rev. Stat. 1991, ch. 127, par. 1001 *et seq.*) to the Board's

hearings. Balmoral contends that the Administrative Procedure Act's "contested case" rules, as provided in section 10 and several subsequent sections, should have been applied in the proceedings denying its application for a license. (Ill. Rev. Stat. 1991, ch. 127, pars. 1010 through 1018.) Arlington and the Board argue that, because the Board had in place existing procedures for conducting dates hearings, the Administrative Procedure Act procedures have no application to them. We have carefully considered the issue and have determined that the Act does apply to dates hearings conducted by the Board.

Before we can discuss this conclusion, we must address Arlington's contention that Balmoral waived this issue because it failed to object at the 1991 dates hearing to the procedures which were utilized. We agree, however, with Balmoral that this issue is not waived.

As Balmoral reminds us, "formal objections go hand in hand with formal proceedings." While Arlington and the Board maintain that the formal proceedings required by the Administrative Procedure Act do not apply to dates hearings conducted by the Board, they cannot likewise maintain that formal objections, as provided for in section 12 of the Act (Ill. Rev. Stat. 1991, ch. 127, par. 1012), are necessary to preserve an argument for review.

This is especially true here, where Balmoral did express discontent with the proceedings adopted by the Board and thereby did raise objections, albeit informally. Balmoral questioned the allegedly capricious administration of the Board's proceedings whereby it was denied access to Arlington's application. This access was sought to prepare a rebuttal argument. Balmoral also inquired as to how the Board could deny it racing dates without notice.

This court has previously recognized, in other contexts, that the purpose of presenting objections is to allow the administrative tribunal to correct possible procedural errors. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 577.) The Board and Arlington cannot claim that the Board was not given any opportunity to correct its informal procedure.

After disposing of that preliminary matter, the issue then before us becomes whether the provisions of the Administrative Procedure Act should govern the proceedings of the Board.

Section 2(a) of the Act reads as follows:

"§2. (a) This Act applies to every agency as defined herein. Beginning January 1, 1978 in case of conflict between the provisions of this Act and the Act creating or conferring power on an agency, this Act shall control. *However if an agency has existing procedures on July 1, 1977 specifically for contested cases or licensing those existing provisions control,* except that this exception respecting contested cases and licensing does not apply if the Act creating or conferring power on the agency adopts by express reference the provision of this Act. Where the Act creating or conferring power on an agency establishes administrative procedures not covered by this Act, such procedures shall remain in effect." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 127, par. 1002(a).

In rendering its opinion, the circuit court stated, "There is no evidence in the record of the proceedings before the ILLINOIS RACING BOARD that establishes it had existing procedures on July 1, 1977 specifically for contested cases or licensing." The circuit court then applied the provisions of the Administrative Procedure Act and held that the proceedings of the Board were such as to amount to a denial of procedural due process to Balmoral.

In response to this holding, the defendants filed a motion to vacate the order of the circuit court, attaching to

it the affidavit of Cecil Troy, a member of the Board, to establish that existing procedures were in place. (This affidavit is hereinafter referred to as the Troy affidavit.)

The Troy affidavit recites the procedures which have been adopted by the Board. Troy, who asserts that he has been a member of the Board since 1975, stated that procedures for conducting race meetings have existed since 1976 and have not changed "in any material respect" since that time. Troy continued that the Board has always conducted dates hearings as if the Administrative Procedure Act did not apply. The remainder of the affidavit outlines various procedures allegedly used by the Board.

In reversing the circuit court, the appellate court stated:

> "Included in the record on appeal is the affidavit of Racing Board member Cecil J. Troy wherein he asserted that the Board has had procedures in place for conducting racing dates hearings since 1976 and that those procedures have not changed in any material respect. He further stated that the Board has always conducted its dates hearings as if the Administrative Procedure Act did not apply and has restricted the right of applicants to ask questions or to cross-examine competing applicants. None of the facts sworn to by Troy are disputed. We hold that the Board proceedings come within the exception to the Act." 214 Ill. App. 3d at 121.

In arguing that this affidavit was improperly considered by the appellate court, Balmoral relies upon section 3—110 of the Administrative Review Law. This section reads in pertinent part:

> "No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court [on review]." Ill. Rev. Stat. 1991, ch. 110, par. 3—110.

However, Supreme Court Rule 321, upon which Arlington and the Board rely, states in pertinent part:

"The record on appeal shall consist of the judgment appealed from, the notice of appeal, and the entire original common law trial court record, unless the parties stipulate for, or the trial court, after notice and hearing, or the reviewing court, orders less. The trial court record includes any report of proceedings prepared in accordance with Rule 323 and *every other document filed and judgment and order entered in the cause*." (Emphasis added.) 134 Ill. 2d R. 321.

Arlington argues that, because the Troy affidavit was introduced as part of the motion before the trial court to vacate a decision of that court, the affidavit had become part of the record pursuant to this rule. However, accepting Arlington's argument would mean that affidavits meant to provide evidence of contested matters, which had not been subjected to any adversarial testing to verify their accuracy, could later be made a part of the record for a reviewing court to evaluate. Accepting Arlington's argument would establish a dangerous precedent.

As we decline to adopt Arlington's interpretation of Rule 321, we need not determine whether section 3—110 or Rule 321 applies to the instant proceeding. Therefore, we need not address the party's arguments concerning administrative versus appellate review. Instead, we conclude that Supreme Court Rule 321 was not meant to include untested evidentiary submissions within its ambit. Rather, we feel that the better interpretation of this rule is that affidavits offered to establish the truth of a matter at issue in the agency or on review should not be considered unless subject to some sort of adversarial examination.

In 1870, this court was faced with a similar sort of issue and, recognizing the problems which could result from this practice, reached this same conclusion we reach today. There, this court stated:

"One serious objection to the admission of *ex parte* affidavits is, that the opposing party is denied the privilege of cross-examination. This is a most efficacious test for the discovery of truth, and should never be departed from, except for actual necessity. A witness, subjected to this test, can not easily impose on the court, or fabricate falsehood. Appellants were deprived of this right." *Becker v. Quigg* (1870), 54 Ill. 390, 394.

Arlington and the Board justify the introduction of this affidavit by alleging that, because of Balmoral's failure to object to the procedures used by the Board at the dates hearing, there was never an opportunity presented to offer evidence of established procedures. We reject this argument. First, as we have shown, Balmoral did voice its objection to the procedures used, albeit informally, and the Board did have an opportunity to address the issue of the procedures which it had adopted. Second, even were we to accept Arlington's contentions, the fact remains that the authenticity of this affidavit's statements were never subjected to scrutiny. It would be a miscarriage of justice, a violation of basic due process protections, to allow the parties to append to the trial record this unexamined affidavit to establish the proof of a matter asserted.

There is no other evidence of existing procedures. Nothing is included in the record to indicate that the Board had a written manual of procedures or even that certain procedures were communicated to all members of the Board, as was indicated when Balmoral was denied access to the application of Arlington.

Further, the record itself belies the existence of *established* procedures. Just one example is the Board's change of policy regarding the submission of evidentiary supplements to the application, an important first step in seeking administrative action before the Board. During

the testimony of the Balmoral representatives, Chairman Griffen of the Board asked:

> "I have a question about the—it's called the evidentiary supplement support of Balmoral's application and I am asking to you [*sic*] use your memories.
>
> *Did not we last year ask* that if such were to be submitted it would be submitted by the end of August along with the application?
>
> Or do you remember?"

When the Balmoral representative indicated that he did not remember what the new rule with regard to evidentiary submissions was, the chairman responded:

> "I am always happy to read about it [Balmoral Racing Club and Balmoral Park Trot], but I thought I had addressed this specific question last year.
>
> *If I did not, let me do it for the future. Simply so the Board may have more time to analyze these matters, I would ask that all applicants provide all materials including supplements by the end of August when the applications themselves are filed.*" (Emphasis added.)

This exchange indicates to us that the Board changed procedures from year to year and notified hearing participants of these changes informally by making an announcement at the annual meeting. Regardless of any arguments made by the Board attempting to distinguish rules and procedures, we therefore conclude that the Board did not have in place established procedures.

Because there is no evidence that procedures existed prior to July 1, 1977, we hold that the Administrative Procedure Act applies to the Board's hearings. The decision which we reach today does not require that we address any further issues raised by the parties concerning whether procedure must be written or whether informal custom may amount to procedure.

The application of the Administrative Procedure Act to the racing dates hearings will be a way to ensure that uniform procedures will be applied throughout the con-

duct of the Board's hearings. In turn, this will guarantee that no party's rights will become prejudiced by a change in the Board's informal proceedings. "It is a truism to say that the horse-racing industry depends upon public confidence in the sport and upon integrity and professional efficiency in its operation." *Phillips v. Graham* (1981), 86 Ill. 2d 274, 286.

We further conclude that the contested-case provisions of the Administrative Procedure Act apply to the proceedings of the Board. Section 16(a) of the Administrative Procedure Act states: "When any licensing is required by law to be preceded by notice and opportunity for hearing, the provisions of this Act concerning contested cases shall apply." (Ill. Rev. Stat. 1991, ch. 127, par. 1016(a).) There is no question but that this issue concerns a licensing matter. Not only do all parties refer to the action taken by the Board as conferring a license, but the action falls squarely within the definition of a license set forth in the Act (Ill. Rev. Stat. 1991, ch. 127, pars. 1003.04, 1003.05). See *Fitch/Larocca Associates, Inc. v. Skinner* (1982), 106 Ill. App. 3d 522 (for an analysis of the licensing requirements of section 16(a)).

In *Pioneer Processing, Inc. v. Environmental Protection Agency* (1984), 102 Ill. 2d 119, this court interpreted this provision, applying it to actions before the Environmental Protection Agency. There, the court adopted a broader interpretation of the notice and hearing requirements of section 16(a). We take the same approach here.

The Racing Act specifically provides for the conduct of a meeting after application for racing dates has been made. (Ill. Rev. Stat. 1991, ch. 8, par. 37—20(e).) The Board argues that, because the statute does not require a "hearing" but merely a "meeting," the contested-case provisions cannot apply. However, we reject this argument, as the Board is playing a game of semantics. Consistently referring to this meeting elsewhere as a "dates

hearing," the Board conducts the meeting after requiring participants to "swear in," allows attorneys representing the parties to appear before it and accepts what is consistently referred to as "evidence" into the record. The Board's own actions have foreclosed this argument. The "meeting," for all intents and purposes, is the required-by-law "hearing."

Section 20(e) also provides for statutory notification of the approximate date of the dates hearing ("all applications for the issuance of an organization license shall be filed with the Board prior to September 1 of the year in which application is made and shall be acted upon by the Board at a meeting to be held on such date as shall be fixed by the Board during the last 15 days of September of such subsequent year"). (Ill. Rev. Stat. 1991, ch. 8, par. 37—20(e).) Moreover, "[u]nless notice of the hearing was sent out, nobody would be aware of the hearing to be held." *Pioneer Processing*, 102 Ill. 2d at 142.

The proceedings of the Board were not conducted in conformity with the contested-case provisions. For instance, the Board's hearing procedures did not allow for the use of objections to evidentiary offers (as required by section 12(a) of the Administrative Procedure Act (Ill. Rev. Stat. 1991, ch. 127, par. 1012(a))) or cross-examination of witnesses (as required by section 12(b) of the Act (Ill. Rev. Stat. 1991, ch. 127, par. 1012(b))). Where an agency action violates the provisions of the Administrative Procedure Act, that agency action is void. (Ill. Rev. Stat. 1991, ch. 127, par. 1014; *Pioneer Processing*, 102 Ill. 2d at 141.) Therefore, the action of the Board at the 1991 dates hearing is void.

### Due Process

Balmoral's final contention is that the proceedings of the 1991 dates hearing violated its due process rights.

Arlington, again, argues that Balmoral has waived this issue. For the reasons presented in discussing Balmoral's waiver of the Administrative Procedure Act issue, we likewise hold that Balmoral did not waive this due process issue. As both the Act and the due process issue relate to procedural infirmities in the hearing, we feel comfortable with equating these arguments. Furthermore, with respect to the due process issue, "We do not presume acquiescence in the loss of fundamental rights." *Ohio Bell Telephone Co. v. Public Utilities Comm'n* (1937), 301 U.S. 292, 307, 81 L. Ed. 1093, 1103, 57 S. Ct. 724, 731.

It is a constitutional right that no State may deprive a person of life, liberty or property without due process of law. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.) "The guaranty of due process of law requires that every man shall have the protection of his day in court and the benefit of the general law,—a law which hears before it condemns, which proceeds not arbitrarily or capriciously but upon inquiry and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society." (*City of Chicago v. Cohn* (1927), 326 Ill. 372, 374.) "There is, of course, no doubt that '[a]dministrative as well as judicial proceedings are governed by the fundamental principles and requirements of due process of law. [Citations.]' " *Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, 51, quoting *Brown v. Air Pollution Control Board* (1967), 37 Ill. 2d 450, 454.

The starting point, in any due process analysis, is a determination of whether one of these protectable interests—life, liberty or property—is present, "for if there is not, no process is due." (*Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 294.) We hold today that every racing license creates a property interest, for, surely, denial

of any racing license forecloses pursuit of a racing establishment's occupation.

In *Freitag v. Carter* (7th Cir. 1973), 489 F.2d 1377, the court dealt with the issue of whether an application for a public chauffeur's license could be summarily denied. In concluding that due process must be afforded the applicant before denying the application, the court stated, "[a] governmental licensing body which judges the fitness of an applicant must afford that applicant adequate notice and a hearing." (*Freitag*, 489 F.2d at 1382.) To justify this conclusion, the court cited the Supreme Court's decision in *Willner v. Committee on Character & Fitness* (1963), 373 U.S. 96, 10 L. Ed. 2d 224, 83 S. Ct. 1175. Therein, the Court stated, " 'A State cannot exclude a person from the practice of law *or any other occupation* in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.' " (Emphasis added.) *Willner*, 373 U.S. at 102, 10 L. Ed. 2d at 229, 83 S. Ct. at 1180, quoting *Schware v. Board of Bar Examiners* (1957), 353 U.S. 232, 238-39, 1 L. Ed. 2d 796, 801, 77 S. Ct. 752, 756.

Without races, a racetrack becomes useless and the investment to maintain that racetrack is worthless. Racing is the business of the racetrack. Denying Balmoral's license affects this business, specifically impacting upon its right to remain profitable and the income of its owners. We conclude that this interest in maintaining an occupation makes Balmoral's interest in retaining a license a property interest which cannot be denied without affording due process. As Justice Douglas notes in his dissent to *Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 584, 33 L. Ed. 2d 548, 565, 92 S. Ct. 2701, 2713, "where 'important interests' of the citizen are implicated (*Bell v. Burson*, 402 U.S. 535, 539) they

are not to be denied or taken away without due process."

It is true that Balmoral received a harness license to race. However, included in the record are separate applications for thoroughbred and harness dates from each of the tracks requesting both. Those participating in the dates hearing are first called to address thoroughbred racing dates. Later, those requesting harness dates are asked to speak. Harness and thoroughbred racing applications are never addressed together. Moreover, during the 1991 dates hearing, one Board member admitted that harness racing meets generate less revenue than thoroughbred meets. Harness and thoroughbred licenses, treated separately by the Board and the racing industry, are, for purposes of due process, separate pieces of property.

Arlington's argument that Balmoral has no "vested interest" to a racing license and cannot, therefore, have a property interest to protect ignores the basic fact that Balmoral is seeking to maintain the occupation in which it has sunk substantial resources. Balmoral, therefore, has something akin to a vested interest in its occupation. While we are not saying that Balmoral cannot be denied racing dates, we are requiring that, if they be denied, this is only accomplished after providing the protections which due process affords.

We turn now to the issue of whether this property right was denied to Balmoral without providing basic due process protections.

Balmoral contends that the Board violated its due process rights in several ways. Because we find that the Board's failure to allow Balmoral an adequate opportunity to cross-examine the witnesses and to inspect the evidence denied Balmoral due process, we need not address the other contentions raised by the parties.

" ' "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." ' " (*Scott*, 84 Ill. 2d at 51, quoting *Mathews v. Eldridge* (1976), 424 U.S. 319, 334, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 902.) Despite the flexibility built into this concept, it is clear that certain minimal guarantees must always be provided. " 'Among the guarantees without which there would be an absence of procedural due process are reasonable notice, the right to examine witnesses, to testify, to present witnesses, and to be represented by counsel.' " (*Brown v. Air Pollution Control Board* (1967), 37 Ill. 2d 450, 454, quoting *Yiannopoulos v. Robinson* (7th Cir. 1957), 247 F.2d 655, 657.) These protections ensure that a fair trial is provided to its participants, for due process of law guarantees a fair and impartial hearing. *Brown*, 37 Ill. 2d at 455.

The opportunity to cross-examine witnesses and to inspect the evidence offered against a party have both been determined to be part of guaranteeing the exercise of due process before an administrative tribunal. (See, *e.g.*, *Ladenheim v. Union County Hospital District* (1979), 76 Ill. App. 3d 90, 96; *Rutledge v. Department of Registration & Education* (1966), 77 Ill. App. 2d 103, 123, citing *Fleming v. Illinois Commerce Comm'n* (1944), 388 Ill. 138, 149.) These protections were denied to Balmoral during the 1991 dates hearing.

Despite its attempts, Balmoral failed to gain access to information which could have been used against its interests. It was not until the dates hearing was almost half over that Balmoral was allowed to examine statements that its races damaged the Illinois racing industry.

The material turned over to Balmoral included a redacted application of a competing racetrack and a six-page, unsworn and unsigned statement, citing statistical evidence, which discussed the problem of concurrent racing meets. A review of the record indicates that this was·

the only material evidence before the Board addressing this issue. Balmoral was given a one-hour lunch break in which to examine this information. After the meeting had been reconvened and the Arlington representative requestioned, Balmoral was asked to address these comments.

At that time, the Balmoral representative indicated that, while the Board had given Balmoral an opportunity to review the statement, it had not had "a chance to study [it] in detail to see problems ***. We can't give any kind of a thorough rebuttal to that given the time-frame we are facing." When the Board asked Balmoral's attorney how much time Balmoral would need, stating, "I don't want a record that's incomplete in the sense that you say you didn't get a chance to study the six-page document," the attorney responded that he would have to consult with his client about that.

At that point, the Board turned to the Balmoral representative and asked him if he would like to make any comments about the statement. The representative said that he could address the statement somewhat and proceeded to do so. After this short testimony, Balmoral's attorney broke in and noted for the Board, "I had no plan on being here to defend against total loss of thoroughbred racing. We did not prepare any sort of detailed statistics. We couldn't be ready in a day or two days to mount some full-fledged evidentiary battle on that point." At no point does the record reveal that the Board ever followed up on Balmoral's assertions that it needed more time to address Arlington's contentions. Instead, the Board proceeded to conclude the hearing.

Despite its request for more time, Balmoral was denied the opportunity to confront the evidence presented against its interests and to subject it to scrutiny. The attorney indicated that he needed more than a few days to prepare a rebuttal argument. Yet all Balmoral was given

was an opportunity to respond that comprises all of 1½ pages within the transcript. This action by the Board, in our opinion, was tantamount to providing Balmoral no opportunity to examine this evidence and respond to it at all. "[M]anifestly there is no hearing when the party does not know what evidence is offered or considered, and *is not given an opportunity to test, explain, or refute."* (Emphasis added.) *Interstate Commerce Comm'n v. Louisville & Nashville R.R. Co.* (1913), 227 U.S. 88, 93, 57 L. Ed. 431, 434, 33 S. Ct. 185, 187.

Moreover, the Board never allowed the parties to cross-examine the testimony of the other participants, who were often asked questions about the other racing hearing parties. Indeed, Arlington states in its brief, "the Board has never allowed cross-examination as a matter of right."

The Board accepted testimony from the various participants concerning exclusivity in racing. The Board even went so far as to specifically discuss with Arlington the effect upon Arlington of simultaneous Balmoral races. Throughout this testimony, only the Board was allowed to address the Arlington representative. Thus, the only examination of this testimony which infringed upon the rights of Balmoral was done by the Board, which was declaredly biased (as noted, one Board member stated, "[I]t's my opinion that Arlington Park has the greatest racing facility in the entire world").

The effect of refusing to allow adequate testing of Arlington's assertions was to deny Balmoral an opportunity to examine the validity of Arlington's claims. The effect of the Board's actions was to place before the Board a clearly one-sided argument for exclusivity and to deny all the parties the opportunity to discern the truth about the value of exclusivity in racing. Cross-examination, as we have already noted elsewhere in this opinion, is "the most efficacious test for the discovery of

the truth." This is why cross-examination is required in order to ensure that due process requirements are met.

Arlington asserts that Balmoral's argument is without merit, as Balmoral presented an evidentiary submission which was likewise unsworn and untested. However, Arlington cites no evidence and we perceive none from the record that Arlington was denied access to this information and therefore was denied the opportunity to confront it and rebut it as Balmoral was.

Arlington also relies upon *Gillilan v. Illinois Racing Board* (1980), 89 Ill. App. 3d 726, to argue that the procedures of the Board have been previously found not to have violated due process. However, in that case, the issue of whether due process was violated concerned the dual role of the Board as both advocate and judge. No such issue is before us today.

It is curious to note that the Board never argued, in the briefs or in oral argument, that it did not violate due process during the dates hearing but, rather, only Arlington presents a vigorous defense to the contentions raised by Balmoral. Regardless of the meaning of the lack of diligence on the part of the Board, we conclude that the actions of the Board denied all its participants due process.

In concluding that due process was violated, we lastly point out that, by following the procedures set forth by the Administrative Procedure Act, the Board should be able to ensure that due process requirements are provided to all racing participants. Specifically, section 12(b) guarantees to agency participants the right of cross-examination. Ill. Rev. Stat. 1991, ch. 127, par. 1012(b).

## CONCLUSION

For all the foregoing reasons, we conclude that the 1991 dates hearing was void. In summary, we find this action is not moot; the Board must consider all five fac-

tors present in section 21(c) of the Racing Act with regard to the applications of all racing participants; the provisions of the Administrative Procedure Act must be adhered to during the meetings of the Board and due process must be afforded the racing participants. This was not done at the 1991 dates hearing. In short, our opinion holds intact the discretion of the Board in awarding dates but mandates that this discretion be exercised after providing a fair and impartial hearing which comports with basic notions of due process. We therefore reverse the judgment of the appellate court, which reversed the judgment of the circuit court. We also reverse the judgment of the circuit court, which directed the Board to award specific thoroughbred racing dates to Balmoral. The order entered by the Board is set aside.

We recognize that Balmoral has filed a subsequent complaint contesting the actions of the Board during the 1992 dates hearing. Action on that case was stayed pending resolution of this appeal. In rendering a decision, the circuit court should consider our decision in this opinion and take action not inconsistent with it.

As viable issues remain as to such things as the award of attorney fees pursuant to the Administrative Procedure Act (Ill. Rev. Stat. 1991, ch. 127, par. 1014.1(b)), we remand this cause to the circuit court for further proceedings.

*Appellate court reversed;*
*circuit court reversed;*
*Board order set aside;*
*cause remanded.*