2019 IL App (1st) 173207

No. 1-17-3207

Filed May 23, 2019

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DOTTY'S CAFE, a/k/a Illinois Cafe & Services Company, LLC, and STELLA'S PLACE and SHELBY'S, a/k/a Laredo Hospitality Ventures, LLC, | ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE ILLINOIS GAMING BOARD; DONALD R. TRACY, HECTOR ALEJANDRE, THOMAS A. DUNN, DEE ROBINSON, and STEVEN C. DOLINS, in Their Official Capacities as Members of the Illinois Gaming Board; MARK OSTROWSKI, in His Official Capacity as Administrator of the Illinois Gaming Board; THE ILLINOIS GAMING MACHINE OPERATORS ASSOCIATION; J&J VENTURES GAMING, LLC; and ACCEL ENTERTAINMENT GAMING, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | No. 17 CH 4854 Honorable Neil Cohen |
| Defendants-Appellees. | ) | Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiffs, Dotty's Cafe, Stella's Place, and Shelby's, challenged the constitutionality of

two provisions of the Video Gaming Act (Gaming Act) (230 ILCS 40/1 *et seq.* (West 2016)), one

that prohibits certain businesses involved in video gaming from being involved in multiple aspects of the video gaming industry (*id.* § 30) and another that requires the business that owns the video gaming machine and the business where that machine is located to equally split the after-tax profits from operating the machine (*id.* § 25(c)). Additionally, they sought to invalidate and prevent the enforcement of a policy document that the Illinois Gaming Board posted to its website pertaining to inducements, advertising, and promotions by businesses licensed to be involved in video gaming. Dotty's Cafe, Stella's Place, and Shelby's posited that the Illinois Gaming Board failed to follow proper rulemaking procedures and exceeded its statutory authority in posting the policy document, and the policy document itself was unconstitutional as well as arbitrary and capricious. The circuit court dismissed the lawsuit, finding both provisions of the Video Gaming Act constitutional and all claims related to the policy document moot because the Illinois Gaming Board removed the document from its website.

¶ 2     Dotty's Cafe, Stella's Place, and Shelby's now appeal that dismissal, contending that the two provisions of the Video Gaming Act are unconstitutional and that their challenge to the Illinois Gaming Board's policy document is not moot. Because we find both provisions of the Video Gaming Act rationally related to a legitimate state interest, both provisions are constitutional. However, we find that two counts related to Dotty's Cafe, Stella's Place, and Shelby's challenge to the Illinois Gaming Board's policy document on inducements, advertising, and promotions are not moot because a determination on the procedures employed by the Illinois Gaming Board in posting the policy document could have a direct impact on the rights and duties of the parties. Furthermore, if Dotty's Cafe, Stella's Place, and Shelby's were to prevail on those counts, they could pursue statutory fees and costs as a result. Although we affirm the circuit court's dismissal of all counts related to the constitutionality of the two provisions of the Video

Gaming Act (counts I through VI) and affirm its dismissal on three counts related to the policy document (counts IX through XI), we find two counts related to the policy document (counts VII and VIII) are not moot. We therefore remand those counts to the circuit court for further proceedings.

¶ 3                                          I. BACKGROUND

¶ 4                                     A. The Video Gaming Act

¶ 5      In July 2009, the Illinois legislature enacted the Gaming Act (Pub. Act 96-34 (eff. July 13, 2009) (adding 230 ILCS 40/1 *et seq.*)), which legalized the use of video gaming machines, such as video poker, blackjack, and slots, as a form of gambling in certain locations. Every individual or business involved in video gaming in Illinois must be licensed, including the manufacturers and distributors of video gaming machines, the owner and operators of the machines, and the establishments where the machines are located. 230 ILCS 40/25, 45 (West 2016). Most relevant in this appeal are the licensed operators and licensed establishments. The operator is the individual or business that buys the video gaming machine from either a manufacturer or distributor, places that machine in a licensed establishment, and becomes responsible for the operation of the machine. *Id.* § 5; 11 Ill. Adm. Code 1800.250 (2014). The establishment is where the machine is located, and includes places that serve alcohol, veteran and fraternal halls, truck stops as well as other places. 230 ILCS 40/5 (West 2016).

¶ 6      But, under the Gaming Act, there is a prohibition on certain individuals and businesses holding multiple licenses. *Id.* § 30. One such prohibition is if an individual or business is licensed as an operator, that individual or business may not also hold a license as an owner or manager of a licensed establishment (the dual-license prohibition). *Id.* Instead, a licensed establishment must contract with an independent individual or business that possesses a license

to be an operator. *Id.* § 25(e). The result of the dual-license prohibition is that, in order to operate a video gaming machine, there must be a joint enterprise between a licensed establishment and a licensed operator.

¶ 7    Not only does the Gaming Act mandate a joint enterprise between a licensed establishment and a licensed operator, the law also regulates it in various ways. See *id.* § 25(c), (e); 11 Ill. Adm. Code 1800.320 (2018). One such manner is how the income is divided. The money generated from any one video gaming machine, defined under the Gaming Act as the "net terminal income," initially is taxed at 30% and collected by the state. 230 ILCS 40/5, 60(a) (West 2016). Of that 30%, five-sixths goes to a capital projects fund and the remainder to local governments. *Id.* § 60(b). The remaining 70%, or the after-tax profits, must be split equally between the licensed establishment and the licensed operator (the profit-splitting requirement) (*id.* § 25(c)), although a small percentage is paid to Scientific Games International, the operator of the central communications system, which helps the state monitor video gaming machines. *Id.* § 15(15); Ill. Gaming Bd., 2018 Annual Report 7 (2018), http://www.igb.illinois.gov/ FilesAnnualReport/2018IGBAnnualReport.pdf    [https://perma.cc/3BUM-FAGE]    (currently, Scientific Games International receives 0.8513%). Along with the profit-splitting requirement, the Gaming Act also prohibits operators from giving "anything of value" to a licensed establishment "as any incentive or inducement to locate video terminals in that establishment." 230 ILCS 40/25(c) (West 2016).

¶ 8    Under the Gaming Act, the legislature has vested the Illinois Gaming Board (Board) with the complete authority to supervise and manage video gaming in Illinois, including the ability to adopt rules and regulations to administer the law. *Id.* § 78. In February 2017, the Board posted a document on its website titled "Illinois Gaming Board Policy on Inducements, Advertising and

Promotions by Video Gaming Licensees" (the policy document), which included "guidance" for compliance with the Gaming Act's prohibition on inducements as well as statements on how operators and establishments must share expenses such as those related to advertising and promotions.

¶ 9                                    B. The Current Litigation

¶ 10    Plaintiffs Dotty's Cafe, Stella's Place, and Shelby's are cafe-style establishments, licensed under the Gaming Act, where patrons can buy food and alcohol and engage in video gaming. Together, plaintiffs operate over 100 such locations in Illinois, including almost 50 in Cook County. In April 2017, they brought an 11-count complaint against the Board challenging the Gaming Act's dual-license prohibition and profit-splitting requirement as well as the Board's policy document on inducements, advertising, and promotions.

¶ 11    Two months later, the circuit court granted the Illinois Gaming Machine Operators Association, a trade association promoting the interests of operators, and J&J Ventures Gaming, LLC, and Accel Entertainment Gaming, LLC, two licensed operators (collectively, intervenors), leave to intervene as defendants in the lawsuit. Plaintiffs subsequently requested, and received, leave from the circuit court to file an amended complaint. The amended complaint added the Board's members, the Board's administrator, and the intervenors as defendants, in addition to the Board itself, and contained 11 counts based on three main issues.

¶ 12    First, plaintiffs alleged that the Gaming Act's dual-license prohibition violated both the federal and state due process clauses, both the federal and state equal protection clauses, and the special legislation clause of the Illinois Constitution (counts I through III, respectively). All three counts sought a declaration that the dual-license prohibition was unconstitutional and an

injunction preventing its enforcement. The federal claims of counts I and II also sought statutory costs and attorney fees.

¶ 13    Second, plaintiffs alleged that the profit-splitting requirement violated both the federal and state due process clauses, both the federal and state equal protection clauses, and the special legislation clause of the Illinois Constitution (counts IV through VI, respectively). All three counts sought a declaration that the profit-splitting requirement was unconstitutional and an injunction preventing its enforcement. The federal claims of counts IV and V also sought statutory costs and attorney fees.

¶ 14    Third, plaintiffs brought various counts related to the Board's policy document on inducements, advertising, and promotions. Count VII alleged that the Board's posting of the policy document on its website constituted improper rulemaking under the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2016)). The count sought a declaration that the policy document was invalid, an injunction preventing its enforcement, and attorney fees and costs under the Administrative Procedure Act. Count VIII alleged that the Board lacked the statutory authority to enact a rule, regulation, or policy dictating how operators and establishments share various expenses. The count sought a declaration that the policy exceeded the Board's rulemaking authority, an injunction preventing its enforcement, and attorney fees and costs under the Administrative Procedure Act. Count IX alleged that the policy document was arbitrary and capricious. The count sought a declaration that the policy document was arbitrary and capricious, an injunction preventing its enforcement, attorney fees and costs under the Administrative Procedure Act, and a declaration that the prohibition on inducements in section 25(c) of the Gaming Act (230 ILCS 40/25(c) (West 2016)) requires the guilty party to act with the purpose or intent to induce a licensed establishment to locate video gaming machines in

a particular establishment. Counts X and XI alleged that the policy document violated both the federal and state due process clauses and both the federal and state equal protection clauses, respectively. Both counts sought a declaration that the policy document was unconstitutional, an injunction preventing its enforcement, and attorney fees and costs under the Administrative Procedure Act and federal law.

¶ 15    Thereafter, intervenors filed a combined motion to dismiss under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2016)). In relevant part, they argued that, under section 2-615 of the Code (*id.* § 2-615), all counts related to the dual-license prohibition and profit-splitting requirement should be dismissed because the provisions were rationally related to legitimate state interests. Additionally, defendants filed a motion to dismiss under section 2-615 of the Code (*id.*), similarly arguing in relevant part that all of plaintiffs' constitutional claims failed because there were rational bases for the statutory provisions. Lastly, defendants contended that the statutory claims challenging the Board's policy document on inducements, advertising, and promotions failed because the policy was merely guidance that rendered the Administrative Procedure Act inapplicable. But to the extent the policy could be considered a legislative rule, defendants asserted that the policy was still consistent with the Gaming Act and not arbitrary and capricious.

¶ 16    After defendants filed their motion to dismiss, the Board removed the policy document from its website. Defendants then brought another motion to dismiss, this time under section 2-619(a)(9) of the Code (*id.* § 2-619(a)(9)), arguing that plaintiffs' claims concerning the Board's policy document on inducements, advertising, and promotions were moot because the Board removed the policy document from its website. Defendants attached to their motion an affidavit from Mark Ostrowski, the Board's administrator, wherein he averred that the "document entitled

- 7 -

'Illinois Gaming Board Policy on Inducements, Advertising and Promotions by Video Gaming Licensees' " was removed from the Board's website and would "not be returned to the Board's website or be made available publicly." Additionally, Ostrowski stated that the Board would neither repost the document nor publicly disseminate it, and as a whole, the Board would not "rely" on the document "as a basis to take any action."

¶ 17    Ultimately, the circuit court dismissed all counts related to the dual-license prohibition and profit-splitting requirement with prejudice pursuant to section 2-615 of the Code (*id.* § 2-615), finding that both provisions were rationally related to legitimate state interests and thus constitutional (counts I through VI). The court also dismissed the counts related to the Board's policy document on inducements, advertising, and promotions with prejudice pursuant to section 2-619(a)(9) of the Code (*id.* § 2-619(a)(9)), finding them moot because the policy document had been removed from the Board's website and Ostrowski's affidavit established that the Board would not repost or rely on the policy again (counts VII through XI).

¶ 18    Plaintiffs subsequently appealed.

¶ 19                                    II. ANALYSIS

¶ 20                        A. Regulatory Overview of Gambling in Illinois

¶ 21    In Illinois, there is no common-law right "to engage in or profit from gambling." *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 26. In fact, gambling is illegal in many forms. See 720 ILCS 5/28-1 (West 2016). But over the years, Illinois has legalized some forms of gambling. See, *e.g.*, 20 ILCS 1605/1 *et seq.* (West 2016) (the Illinois Lottery Law); 230 ILCS 5/1 *et seq.* (West 2016) (the Illinois Horse Racing Act of 1975); 230 ILCS 10/1 *et seq.* (West 2016) (the Riverboat Gambling Act); 230 ILCS 15/0.01 *et seq.* (West 2016) (the Raffles and Poker Runs Act). And because the right to gamble legally is provided inasmuch as the legislature

allows, gambling, when legal, is an activity subject to extensive regulation. *Phillips v. Graham*, 86 Ill. 2d 274, 285-86 (1981).

¶ 22    To better understand the Gaming Act, it is necessary to understand to some extent the Riverboat Gambling Act, which was enacted in 1990 and legalized gambling on riverboat casinos. Pub. Act 86-1029 (eff. Feb. 7, 1990) (adding Ill. Rev. Stat. 1991, ch. 120, ¶ 2401 *et seq.*). In legalizing riverboat gambling, our legislature stated the intent of the law was to benefit Illinois citizens economically, but cautioned that this goal would be achieved "successfully only if public confidence and trust in the credibility and integrity of the gambling operations and the regulatory process is maintained." Ill. Rev. Stat. 1991, ch. 120, ¶ 2402(b). To that end, the legislature asserted that the "regulatory provisions of [the Riverboat Gambling Act] are designed to strictly regulate the facilities, persons, associations and practices related to gambling operations pursuant to the police powers of the State." *Id.* And the Riverboat Gambling Act vested those regulatory powers in the newly created Illinois Gaming Board. *Id.* ¶¶ 2402, 2405.

¶ 23    Nineteen years after our legislature enacted the Riverboat Gambling Act, it enacted the Gaming Act. Pub. Act 96-34 (eff. July 13, 2009) (adding 230 ILCS 40/1 *et seq.*). And in doing so, it was the legislature's goal to make much of the Gaming Act consistent with the Riverboat Gambling Act. See 230 ILCS 40/80 (West 2016) ("The provisions of the Illinois Riverboat Gambling Act, and all rules promulgated thereunder, shall apply to the Video Gaming Act, except where there is a conflict between the 2 Acts."). In the Gaming Act itself, there is no expressly stated legislative intent, meaning we can conclude that, just like the Riverboat Gambling Act, the legislative intent of the Gaming Act was to spur economic development. See *id.*; Ill. Rev. Stat. 1991, ch. 120, ¶ 2402. But just like the Riverboat Gambling Act, this goal

could only be achieved if there is public confidence and trust in the integrity of the gaming operations and the regulatory process is maintained. See Ill. Rev. Stat. 1991, ch. 120, ¶ 2402. To be sure, the regulations of the Gaming Act, which were promulgated by the Board itself, reiterate the importance of maintaining public confidence and integrity in video gaming. See 11 Ill. Adm. Code 1800.210(d)-(f) (2009) (stating that all individuals and businesses licensed under the Gaming Act have an ongoing duty to conduct themselves in a manner that does not pose a threat to the general welfare of Illinois citizens, does not discredit the video gaming industry, and does not reflect adversely on the integrity of the video gaming industry). With that overview in mind, we now turn to the claims raised in plaintiffs' amended complaint.

¶ 24                    B. Counts I Through VI

¶ 25    Plaintiffs first contend that they sufficiently alleged that the Gaming Act's dual-license prohibition and profit-splitting requirement were unconstitutional and, thus, the circuit court's dismissal was improper.

¶ 26    The circuit court dismissed counts I through VI—all counts related to the dual-license prohibition and profit-splitting requirement—pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2016)). A motion to dismiss under section 2-615 challenges the legal sufficiency of the complaint based on defects that are apparent on its face. *Wilson v. County of Cook*, 2012 IL 112026, ¶ 14. The critical question is whether the allegations in the complaint, when viewed in the light most favorable to the plaintiffs, are sufficient to state a cause of action upon which relief can be granted. *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 23. In answering this question, we must accept all well-pled facts and reasonable inferences from those facts as true. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 47. A complaint should be dismissed "only if it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief."

*Wilson*, 2012 IL 112026, ¶ 14. We review the circuit court's ruling on a motion to dismiss *de novo* (*id.*), and we may affirm the lower court on any basis appearing in the record, even if the court did not rely on that specific reasoning (*Razavi v. School of the Art Institute of Chicago*, 2018 IL App (1st) 171409, ¶ 41).

¶ 27 Additionally, in reviewing a claim concerning the constitutionality of a statute, we must presume that the challenged legislative enactment is constitutional, and the party raising the constitutional challenge has the burden to prove otherwise. *Bartlow v. Costigan*, 2014 IL 115152, ¶ 18. Where a party asserts a facial constitutional challenge, as is the case here, that burden is "particularly heavy." *Id.* "A facial challenge to a legislative act is the most difficult challenge to mount successfully because the challenger must establish that under no circumstances would the challenged act be valid." *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 33. We review the constitutionality of a statute, as a question of law, also *de novo*. *Oswald v. Hamer*, 2018 IL 122203, ¶ 9.

¶ 28 In this case, plaintiffs have alleged that the dual-license prohibition and profit-splitting requirement are unconstitutional under the federal and state due process clauses, the federal and state equal protection clauses, and the special legislation clause of the Illinois Constitution.

¶ 29 The due process clauses, which are found in the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), prohibit the government from depriving a person of life, liberty, or property without due process of law. Consistent with their nearly identical language, our courts generally analyze federal and state due process claims using the same standards unless good cause exists to interpret them differently. *Hope Clinic*, 2013 IL 112673, ¶ 92. Good cause is shown where there is "something in the constitutional debates and records, or our state history or

custom, which would suggest that a different meaning should attach to our due process" clause. *Id.* The parties do not suggest a departure is necessary, and we similarly find nothing warranting one, so we may analyze the federal and state due process claims together.

¶ 30 Due process claims are either procedural or substantive. See *In re Marriage of Miller*, 227 Ill. 2d 185, 197 (2007). Procedural claims concern the procedures used to allegedly deny a person of life, liberty, or property, whereas substantive claims concern the government's ability to regulate the alleged deprivation at issue, regardless of the procedures involved. *Id.* This case involves the latter, where the threshold question is whether the statute at issue implicates a fundamental right. *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 28. The parties agree that no fundamental right is implicated, meaning we analyze the statute by employing the rational-basis test. *Marks v. Vanderventer*, 2015 IL 116226, ¶ 25.

¶ 31 The equal protection clauses, which are also found in the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), prohibit the government from denying a person equal protection under the law. Similar to due process claims, our courts generally analyze federal and state equal protection claims using the same standards. *In re Destiny P.*, 2017 IL 120796, ¶ 14. The guarantee of equal protection requires the government to treat similarly situated individuals "in a similar fashion unless the government can demonstrate an appropriate reason to treat them differently." *Id.* Axiomatically, in an equal protection claim, the party raising the claim must show that it is similarly situated to the comparison group. *In re M.A.*, 2015 IL 118049, ¶ 25. And, like due process claims, when a fundamental right is not implicated, we analyze the statute by employing the rational-basis test. *In re Destiny P.*, 2017 IL 120796, ¶ 14.

¶ 32    The special legislation clause of the Illinois Constitution prohibits the legislature from enacting a "special or local law when a general law is or can be made applicable." Ill. Const. 1970, art. IV, § 13. The clause prohibits the legislature "from conferring a special benefit or privilege upon one person or group of persons and excluding others that are similarly situated." *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 18. Its purpose is to prevent the legislature from enacting arbitrary classifications that discriminate in favor of a particular group absent a legitimate reason. *Id.* But merely because a law treats one group of people differently than another does not mean that the special legislation clause is implicated. *Id.* ¶ 22. Determining whether a law runs afoul of the special legislation clause requires a two-part analysis. *Id.* ¶ 23. First, we must determine if the statutory classification discriminates in favor of a particular group, and second, if it does, we must determine whether the classification is arbitrary. *Id.* Like due process and equal protection claims, where a fundamental right or suspect class is not implicated, we analyze the statute by employing the rational-basis test. *Id.* ¶ 24.

¶ 33    For simplicity sake, we will assume *arguendo* that licensed operators are similarly situated to licensed establishments for purposes of the equal protection and special legislation clause claims, and the dual-license prohibition and profit-splitting requirement discriminate in favor of licensed operators for purposes of the special legislation clause. Because of these preliminary assumptions, we may proceed directly to the ultimate inquiry of whether there is a rational basis for the statutory provisions.

¶ 34    Under the rational-basis test, a statute will be found constitutional if it "bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable." *Marks*, 2015 IL 116226, ¶ 25. In employing this test, we first must determine whether the public interest the statute is intended to serve is legitimate, and if so, "determine whether the statute bears a

rational relationship to that interest, and, finally, determine whether the method chosen by the legislature to protect or further that interest is reasonable." *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 125 (2004). Though rational-basis review is "highly deferential" to the legislature (*id.*), this does not mean that we can blindly accept legislation. *People v. Pepitone*, 2018 IL 122034, ¶ 17. But we cannot focus on whether the provision at issue is the best method to achieve the desired result or even wise. *Hayashi*, 2014 IL 116023, ¶ 29. That analysis is only within the purview of our legislature. *Id.* In the judiciary, our inquiry is constrained, and so "long as there is a reasonably conceivable set of facts showing that the legislation is rational, it must be upheld." *Id.* In performing our analysis, we "may hypothesize reasons for the legislation, even if the reasoning advanced did not motivate the legislative action." *People ex rel. Lumpkin v. Cassidy*, 184 Ill. 2d 117, 124 (1998). And as our review of the legislative history of both provisions reveals no express discussion of either of them, and the parties on appeal do not direct us to any such legislative history, we are left with only hypothetical reasons for the legislation.

¶ 35                                      1. The Dual-License Prohibition

¶ 36     Counts I through III all concerned the Gaming Act's dual-license prohibition. Under this provision, certain licensees are prohibited from holding multiple licenses. 230 ILCS 40/30 (West 2016). The provision provides that:

> "A video gaming terminal manufacturer may not be licensed as a video gaming
>
> terminal operator or own, manage, or control a licensed establishment, licensed
>
> truck stop establishment, licensed fraternal establishment, or licensed veterans
>
> establishment, and shall be licensed to sell only to persons having a valid
>
> distributor's license or, if the manufacturer also holds a valid distributor's license,
>
> to sell, distribute, lease, or market to persons having a valid terminal operator's

license. A video gaming terminal distributor may not be licensed as a video gaming terminal operator or own, manage, or control a licensed establishment, licensed truck stop establishment, licensed fraternal establishment, or licensed veterans establishment, and shall only contract with a licensed terminal operator. A video gaming terminal operator may not be licensed as a video gaming terminal manufacturer or distributor or own, manage, or control a licensed establishment, licensed truck stop establishment, licensed fraternal establishment, or licensed veterans establishment, and shall be licensed only to contract with licensed distributors and licensed establishments, licensed truck stop establishments, licensed fraternal establishments, and licensed veterans establishments. An owner or manager of a licensed establishment, licensed truck stop establishment, licensed fraternal establishment, or licensed veterans establishment may not be licensed as a video gaming terminal manufacturer, distributor, or operator, and shall only contract with a licensed operator to place and service this equipment."

*Id.*

¶ 37 Section 30 of the Gaming Act has essentially created a three-tier regulatory structure of (1) manufacturers and distributors, (2) operators, and (3) establishments whereby anyone involved in video gaming in Illinois can only be licensed under one tier. The manufacturers build the video gaming machines, and the distributors, who sometimes are also the manufacturers, sell the machines to the operators. It is the operators' responsibility then to enter into use agreements with establishments (*id.* § 25(e)) and install the terminals in the establishments, where eventually the public will visit and use the video gaming machines. Because of section 30, two independent

licensed parties—the operator and the establishment—are needed to have a fully operational video gaming machine.

¶ 38    Initially, it is undisputed by any party that the State has a legitimate interest in creating and maintaining public confidence and integrity in the video gaming industry. Because gambling is an activity that our legislature may completely prohibit, the State has a legitimate interest in creating and maintaining public confidence and integrity in the gambling activities it chooses to legalize. *Phillips*, 86 Ill. 2d at 286. These state interests are also under the general umbrella of consumer protection and public health, which are also undeniably legitimate state interests. See *Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988) (finding consumer protection a legitimate state interest); *Stokovich*, 211 Ill. 2d at 129 (finding public health a legitimate state interest).

¶ 39    While plaintiffs concede that there are many legitimate state interests that our legislature could pursue with respect to video gaming, they argue that the dual-license prohibition does not further any of these interests. Rather, they posit that the prohibition demonstrates unfair favoritism of licensed operators at the expense of licensed establishments that, because of the prohibition, are forced to participate in a joint enterprise. Plaintiffs assert that, because the prohibition only protects the interests of operators, in particular economically, the prohibition serves no legitimate state interest. And thus, according to plaintiffs, the dual-license prohibition is unconstitutional.

¶ 40    However, we find the dual-license prohibition rationally related to the state's interests of creating and maintaining public confidence and integrity in the video gaming industry in at least two ways. First, the dual-license prohibition prevents one individual or business from obtaining exclusive control of not only the operation of a video gaming machine but also its creation. As previously discussed, the Gaming Act essentially created three tiers of video gaming

involvement—(1) manufacturers and distributors, (2) operators, and (3) establishments—whereby anyone involved in video gaming in Illinois can only be licensed under one tier. See 230 ILCS 40/30 (West 2016). Without the dual-license prohibition, one individual or business could build the video gaming machine, operate and maintain the machine, and own the establishment where the machine is located. In other words, that individual or business could control every phase of the supply chain from manufacturing to retail, which could lead to vertical integration in the video gaming industry and suppress competition.

¶ 41    To better understand the negatives associated with vertical integration, the Liquor Control Act of 1934 (Liquor Act) (235 ILCS 5/1-1 *et seq.* (West 2016)) is illustrative. In January 1919, the eighteenth amendment was ratified (*Dillon v. Gloss*, 256 U.S. 368, 376 (1921)), which banned the sale and manufacture of alcohol in the United States. U.S. Const., amend. XVIII. In December 1933, the twenty-first amendment was ratified (*United States v. Chambers*, 291 U.S. 217, 222 (1934)), which repealed the eighteenth amendment and thereby legalized the sale and manufacture of alcohol in the United States. U.S. Const., amend. XXI. Shortly thereafter, in January 1934, the Illinois legislature enacted the Liquor Act, which at the time was called the Alcoholic Liquors Act. 1933-34 Ill. Laws 2d Spec. Sess. 57 (art. I, § 1 *et seq.*).

¶ 42    The Liquor Act, with some exceptions, generally required, and still requires, all individuals or businesses that manufacture, transport, or sell alcohol in Illinois to be licensed by the State. 1933-34 Ill. Laws 2d Spec. Sess. 60-61 (art. II, §1); 235 ILCS 5/2-1 (West 2016). And from the law's enactment in 1934 and still today, licensees were and are divided into three broad tiers of (1) manufacturers, (2) distributors, and (3) retailers. 1933-34 Ill. Laws 2d Spec. Sess. 66-67 (art. V, § 1); 235 ILCS 5/5-1 (West 2016). And generally, obtaining a license within one tier meant and means that the individual or business could not obtain a license within another tier.

See 1933-34 Ill. Laws 2d Spec. Sess. 69 (art. VI, § 3); 235 ILCS 5/5-1 (West 2016). As the Seventh Circuit Court of Appeals recently recognized in *Lebamoff Enterprises, Inc. v. Rauner*, 909 F.3d 847, 850 (7th Cir. 2018), under the Liquor Act,

> "[l]ike most states, Illinois divides merchants into three tiers. Licensed producers (tier 1) sell to licensed distributors (tier 2), who then sell to licensed retailers (tier 3), who in turn sell to consumers. Each tier is heavily regulated. Various specialized licenses are available on all three tiers of the system, and many of those licenses are exclusive, meaning that they preclude the holder from obtaining different types of licenses within the system."

The three-tier system was at the heart of the Liquor Act. See 235 ILCS 5/6-1.5 (West 2016) ("The General Assembly hereby restates that it is the policy of this State that the primary purpose of [the Liquor Act] is to protect the health, safety, and welfare of this State through the sound and careful control and regulation of the manufacture, distribution, and sale of alcoholic liquor through a 3-tier regulatory system."). And the United States Supreme Court has deemed the general framework of three-tier system in the alcohol industry " 'unquestionably legitimate.' " *Granholm v. Heald*, 544 U.S. 460, 489 (2005) (quoting *North Dakota v. United States*, 495 U.S. 423, 432 (1990)).

¶ 43    Historically, the three-tier regulatory system in the alcohol industry was intended to prevent vertically integrated organizations, known colloquially as "tied houses" (*Lebamoff Enterprises*, 909 F.3d at 850), whereby manufacturers exercised control over the distributors and retailers, and thereby rendered them essentially one in the same. *Carling Brewing Co. v. George F. Doyle Distribution Co.*, 41 Ill. App. 3d 116, 118 (1976). Over time, "[t]ied houses became associated with such evils as political corruption." *Ted Sharpenter, Inc. v. Illinois Liquor Control*

*Comm'n*, 119 Ill. 2d 169, 175 (1987). The possibility of this evil as well as others prompted the legislature to enact section 6-5 of the Liquor Act, which generally prohibited manufacturers and distributors from lending money or giving " 'anything of value' " to retailers unless expressly allowed by the Liquor Act. *Id.* at 174-75 (quoting Ill. Rev. Stat. 1983, ch. 43, ¶ 122). This section of the Liquor Act "sought to prohibit the gifts and loans which made [tied houses or vertically integrated organizations] possible." *Id.* at 175. Another common justification for preventing vertically integrated organizations was to avoid marketplace monopolies, where one entity could dominate the entire industry (*Dickerson v. Bailey*, 336 F.3d 388, 397 (5th Cir. 2003)), often that entity being associated with organized crime. *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 187 (2d Cir. 2009). In short, the three-tier regulatory system created as part of the Liquor Act served to prevent vertically integrated organizations and the evils associated with such entities.

¶ 44    Plaintiffs, however, argue that the comparison between the dual-license prohibition of the Gaming Act and the three-tier regulatory system of the Liquor Act is not analogous because, for one, alcohol is a commodity whereas video gaming is an activity. Further, plaintiffs argue that operators under the Gaming Act are not at all akin to either manufacturers or distributors under the Liquor Act, as operators do not manufacturer or distribute anything and there is a specific license for all three types of businesses under the Gaming Act. Plaintiffs also highlight the Liquor Act's express establishment of the three-tier regulatory system (see 235 ILCS 5/6-1.5 (West 2016)) and posit that, if our legislature intended the Gaming Act to be similarly construed, it would have expressly done so like it did in the Liquor Act. Despite the differences pointed to by plaintiffs, it simply cannot be ignored that the Gaming Act, like the Liquor Act, has three broad tiers of licensees within the supply chain of video gaming, and an individual or business may only be licensed within one tier. Although the legislative history has never indicated that the

dual-license prohibition of the Gaming Act was modeled after the three-tier regulatory system of the Liquor Act, the two laws undoubtedly share unmistakable similarities with respect to tier licensing.

¶ 45    Given the similarities, it is conceivable that our legislature prohibited dual licensing as a mechanism to prevent one entity from controlling all levels of the video gaming industry, thereby preventing vertically integrated organizations and the negatives associated with them. See *Arnold's Wines*, 571 F.3d at 187; *Dickerson*, 336 F.3d at 397; *Ted Sharpenter*, 119 Ill. 2d at 175. Notably, one such negative is industry domination by organized crime which, while pervasive in the alcohol industry (see *Arnold's Wines*, 571 F.3d at 187), likewise has roots in the gambling industry. See *Finish Line Express Inc. v. City of Chicago*, 72 Ill. 2d 131, 138 (1978) (finding a section of the Horse Racing Act of 1975 that criminalized racetrack-messenger services, business that would go to race tracks on behalf of individuals and place bets with the individuals' money for a fee, constitutional because a legislative report had found widespread problems with such businesses such as "involvement of organized crime"); *Byrd v. Hamer*, 408 Ill. App. 3d 467, 493 (2011) (finding a justification in Illinois's tax law that limited the deduction of losses for professional gamblers and denied any deduction for recreational gamblers because of "concerns over the nature of gambling," which included " 'at least some public perception that organized crime has infiltrated the business world of gambling' " (quoting *Valenti v. Commissioner*, 68 T.C.M. (CCH) 838, 841 (1994))).

¶ 46    Furthermore, the issue of organized crime was raised in a legislative debate about video gaming, albeit not specifically with regard to the dual-license prohibition. In a House of Representatives debate, one representative asked about an allegation "in the newspapers that organized crime has some involvement in the video poker industry. What would this Bill do to

address that issue?" 96th Ill. Gen. Assem., House Proceedings, May 21, 2009, at 110 (statements of Representative Froehlich). In response, another representative downplayed the assertion, stating he was not sure it was an accurate allegation and one could "argue that organized crime's involved in a lot of things in Illinois." 96th Ill. Gen. Assem., House Proceedings, May 21, 2009, at 110 (statements of Representative Lang). That representative added that "one of the two largest manufacturers of these games *** are in the State of Illinois and no one's ever accused them of being involved in organized crime." *Id.* Because of the perception that organized crime could be involved in video gaming, it is conceivable that the dual-license prohibition acts as a countermeasure, like in the alcohol industry, from organized crime dominating all aspects of the video gaming industry. Similarly, it is conceivable that the dual-license prohibition acts as a countermeasure, like in the alcohol industry, to vertically integrated organizations in which only a few entities control the entire video gaming industry, regardless of the possible perception of organized crime's involvement. Because of this, the dual-license prohibition is rationally related to the state's interest in maintaining public confidence and integrity in the video gaming industry, and presents a reasonable method to achieve this goal.

¶ 47    Still, plaintiffs argue that the dual-license prohibition actually decreases competition by restricting the number of potential competitors. They assert that, if licensed establishments could obtain operator licenses and could purchase their own video gaming machines, the current licensed operators would have to justify the quality and cost of their services. Because the licensed establishments could themselves buy and maintain their own gaming machines, the marketplace for operating the machines would become more competitive rather than the current system where two independent businesses are forced into a joint enterprise. Plaintiffs' argument is essentially one of economic theory regarding a free-market promoting competition. As the

Ninth Circuit Court of Appeals once stated, "competition is essential to the effective operation of the free market because it encourages efficiency, promotes consumer satisfaction and prevents the accumulation of monopoly profits." *United States v. Syufy Enterprises*, 903 F.2d 659, 668 (9th Cir. 1990). And as plaintiffs note, several states who have legalized video gaming—Montana, Nevada, Louisiana, South Dakota, and West Virginia—have no prohibitions on the establishments that host video gaming from also owning the video gaming machines themselves. See Mont. Code Ann. § 23-5-110 *et seq.* (West 2016) (Montana); Nev. Rev. Stat. Ann. § 463.010 *et seq.* (West 2016) (Nevada); La. Stat. Ann. § 27:401 *et seq.* (West 2016) (Louisiana); S.D. Codified Laws § 42-7A-42 (2016) (South Dakota) ("[n]othing in this section restricts an owner or manager of a licensed establishment from owning video lottery machines" *i.e.*, video poker, blackjack, etc., "licensed under § 42-7A-41 and placing such machines on the premises, provided they meet the same requirements of video machine operators"); W. Va. Code Ann. § 29-22B-101 *et seq.* (West 2016) (West Virginia). Conversely, Pennsylvania, which in October 2017 enacted its video gaming law, has a dual-license prohibition. See 4 Pa. Stat. and Cons. Stat. Ann. § 3519 (West 2018).

¶ 48    Plaintiffs undoubtedly have a point that a system without the dual-license prohibition could potentially promote competition better than the current system. But, by having the dual-license prohibition, vertically integrated organizations are prevented, which may promote competition by preventing large, resource-heavy organizations from dominating all aspects of the video gaming industry, in addition to eliminating the other negatives associated with vertically integrated organizations. While the dual-license prohibition may not be the best means or even a wise method in achieving public confidence and integrity in the video gaming industry, we cannot invalidate a statute for these reasons. See *Hayashi*, 2014 IL 116023, ¶ 29.

¶ 49 Not only does the dual-license prohibition prevent vertically integrated organizations and conceivably promote competition in the video gaming industry, the prohibition also conceivably creates a stronger system of self-regulation among operators and establishments to better ensure regulatory compliance. Under the Gaming Act's regulations, licensees have certain duties based upon their license (see 11 Ill. Adm. Code 1800.230-1800.250 (2014); 11 Ill. Adm. Code 1800.260-1800.270 (2016)), but all licensees are required to report to the Board any violation of the Gaming Act or its regulations within 21 days (11 Ill. Adm. Code 1800.220(a) (2017)). Where an operator and an establishment are independent entities, but nevertheless engaged in a joint enterprise, each has an incentive to ensure the other's compliance with the Gaming Act and its regulations so that the other's potential noncompliance does not negatively affect its own business. See Roni A. Elias, *Three Cheers for Three Tiers: Why the Three-Tier System Maintains Its Legal Validity and Social Benefits After Granholm*, 14 DePaul Bus. & Com. L.J. 209, 219-20 (2015) (finding that, under the three-tier alcohol regulatory system, "private actors at each of the three tiers have significant incentives to assure that their business partners in the other tiers adhere to regulations").

¶ 50 The legislative history of the Gaming Act does show that regulatory oversight by the Board was a concern. During a House of Representatives debate, one representative noted that by passing the Gaming Act, there was a risk of overburdening the Board, which at the time already had oversight responsibility for nine casinos. 96th Ill. Gen. Assem., House Proceedings, May 21, 2009, at 107 (statements of Representative Froehlich). That representative asked if the legislature could "expect the [Board] to have to expand a little bit to be able to keep up with a broad new responsibility?" 96th Ill. Gen. Assem., House Proceedings, May 21, 2009, at 108 (statements of Representative Froehlich). In response, another representative assuaged concerns that the Board

would not be able to handle the extra regulatory responsibility, but stated that he was "certain [the Board will] have to bring on some new people to do that." 96th Ill. Gen. Assem., House Proceedings, May 21, 2009, at 107-08 (statements of Representative Lang).

¶ 51    According to the Board's 2018 Annual Report, by the end of 2018, there were 6773 "live locations" where video gaming occurs with 30,694 video gaming machines, or "a figure equivalent to the number of positions at almost 25 casinos." See Ill. Gaming Bd., 2018 Annual Report 12 (2018), http://www.igb.illinois.gov/FilesAnnualReport/2018IGBAnnualReport.pdf [https://perma.cc/3BUM-FAGE]. These numbers were in addition to the now 10 casinos being operated in Illinois. See *id.* at 8. And the amount of live locations and video gaming machines existing in Illinois is dramatically increasing. In 2014, when there were still 10 active casinos, there were 4675 live locations and 19,182 video gaming machines; in 2015, 5222 live locations and 22,135 video gaming machines existed; in 2016, 5726 live locations and 24,840 video gaming machines existed; and in 2017, 6359 live locations and 28,271 video gaming machines existed. See Ill. Gaming Bd., 2017 Annual Report 12 (2017), http://www.igb.illinois.gov/ FilesAnnualReport/2017IGBAnnualReport.pdf [https://perma.cc/EW9Z-EN5R]; Ill. Gaming Bd., 2016 Annual Report 12 (2016), http://www.igb.illinois.gov/FilesAnnualReport/ 2016IGBAnnualReport.pdf [https://perma.cc/GC32-ZQAF]; Ill. Gaming Bd., 2015 Annual Report 12 (2015), http://www.igb.illinois.gov/FilesAnnualReport/2015IGBAnnualReport.pdf [https://perma.cc/7UKN-5CAT]; Ill. Gaming Bd., 2014 Annual Report 11 (2014), http:// www.igb.illinois.gov/FilesAnnualReport/2014IGBAnnualReport.pdf    [https://perma.cc/ZUD3- ZRVZ]. But despite the amount of video gaming machines and live locations increasing significantly every year, the Board's staff has been decreasing every year since 2014, with the exception of 2018, when the Board's staff remained the same as 2017. See Ill. Gaming Bd., 2018

Annual Report 3 (2018), http://www.igb.illinois.gov/FilesAnnualReport/ 2018IGBAnnualReport.pdf [https://perma.cc/3BUM-FAGE] (235 employees); Ill. Gaming Bd., 2017 Annual Report 2 (2017), http://www.igb.illinois.gov/FilesAnnualReport/ 2017IGBAnnualReport.pdf [https://perma.cc/EW9Z-EN5R] (235 employees); Ill. Gaming Bd., 2016 Annual Report 2 (2016), http://www.igb.illinois.gov/FilesAnnualReport/ 2016IGBAnnualReport.pdf [https://perma.cc/GC32-ZQAF] (256 employees); Ill. Gaming Bd., 2015 Annual Report 2 (2015), http://www.igb.illinois.gov/FilesAnnualReport/ 2015IGBAnnualReport.pdf [https://perma.cc/7UKN-5CAT] (282 employees); Ill. Gaming Bd., 2014 Annual Report 2 (2014), http://www.igb.illinois.gov/FilesAnnualReport/ 2014IGBAnnualReport.pdf [https://perma.cc/ZUD3-ZRVZ] (284 employees). Or to put these numbers in perspective, in 2014, there were 16.46 live locations per employee of the Board, whereas in 2018, there were 28.82 live locations per employee of the Board, an increase of approximately 75%. While this court will not pretend to know the Board's organizational structure and how many employees are dedicated to video gaming specifically, it is nevertheless striking to see that, while the amount of video gaming in Illinois is increasing dramatically, the amount of staff employed by the Board is not reflecting this increase.

¶ 52    Given that the Board also is the regulatory agency in charge of riverboat gambling, it is possible that our legislature foresaw the need for a complementary system of self-regulation in addition to the regulatory oversight performed by Board, which could have various fluctuations in the amount of staff. Our legislature may have believed that a sound method to achieve self-regulation under the Gaming Act and its regulations would be to require two independent entities to work together in a joint enterprise rather than allowing one entity to completely control the operation of a video gaming machine. In this manner, the dual-license prohibition, which could

promote regulatory compliance, is rationally related to the state's interest in maintaining public confidence and integrity in the video gaming industry and presents a reasonable method to achieve this goal.

¶ 53    Nevertheless, regardless of these potential rationales for the dual-license prohibition, plaintiffs posit that the prohibition is purely a form of economic protectionism of licensed operators and has a far too tenuous connection to any legitimate state interest. They highlight *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013); *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008); *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002), where various federal circuit courts of appeals struck down licensing schemes as unconstitutional, and argue a similar result is warranted for the dual-license prohibition.

¶ 54    In *St. Joseph Abbey*, 712 F.3d at 217, a Louisiana law essentially provided funeral homes the exclusive right to sell caskets within the state. The Louisiana government argued that the law was rationally related to protecting consumers from deceptive practices and public health. *Id.* at 221. The Fifth Circuit Court of Appeals, however, rejected that argument and found the real purpose behind the law was economic protectionism of the funeral industry, specifically to shield funeral homes from intrastate competition for caskets sales. *Id.* at 225-26. In rejecting the government's argument that the law was necessary to protect consumers from deceptive practices, the court found that such practices were already barred by other laws. *Id.* And in rejecting the government's argument that the law was related to public health, the court found the "law elides the realties [*sic*] of Louisiana's regulation of caskets and burials," which was not an area the state had previously regulated. *Id.* at 226. Notably, according to the court, Louisiana law did not require caskets for burial, did not mandate any specifications related to their design or construction, and did not require funeral directors to hold any special expertise concerning

caskets. *Id.* Consequently, the Fifth Circuit Court of Appeals found that the Louisiana law was not rationally related to a legitimate government interest. *Id.* at 227. In stark contrast to *St. Joseph Abbey*, gambling is an area heavily regulated in Illinois and the Gaming Act regulates video gaming unlike any other laws existing in the state. *St. Joseph Abbey* is thus inapposite.

¶ 55    In *Craigmiles*, 312 F.3d at 222, similar to *St. Joseph Abbey*, a Tennessee law prohibited anyone from selling caskets unless they were licensed as a funeral director. The Tennessee government also argued that the law was rationally related to protecting consumers in the area of public health. *Id.* at 225. The Sixth Circuit Court of Appeals, however, rejected that argument, initially finding no promotion of public health because casket vendors would merely sell them to consumers and would never handle bodies or perform embalming services. *Id.* The court then found that, while the quality of caskets could potentially threaten public health, *i.e.*, if the caskets were to leak, there was no evidence that licensed funeral directors were selling caskets that were more protective than those sold by other retailers. *Id.* at 225-26. Consequently, the Sixth Circuit Court of Appeals found that the Tennessee law was a "naked attempt to raise a fortress protecting the monopoly rents that funeral directors extract from consumers" and not rationally related to a legitimate government interest. *Id.* at 229. In contrast to *Craigmiles*, for the reasons outlined above, the dual-license prohibition is not a naked attempt to protect licensed operators but rather is a conceivable method to prevent vertical integration and promote competition in the video gaming industry as well as a conceivable method to promote self-regulation.

¶ 56    Lastly, in *Merrifield*, 547 F.3d at 981-82, a California law required non-pesticide pest controllers of animals such as bats, raccoon, skunks, and squirrels to be licensed, but exempted from the licensure requirement non-pesticide pest controllers of animals such as mice, rats, and pigeons. The difference between needing a license and not needing one was based purely on

what animals the non-pesticide pest controllers targeted. *Id.* The California government argued that the law was rationally related to consumer protectionism and public health. *Id.* at 986. The Ninth Circuit Court of Appeals, however, rejected that argument and found the exemption within non-pesticide pest controllers to be irrational. *Id.* at 992. The court observed that there was no rational basis for "singling out of three types of vertebrate pests from all other vertebrate animals" and instead the exemption was purely "designed to favor economically certain constituents," *i.e.*, certain pest controllers, "at the expense of others similarly situated." *Id.* at 991. In contrast to *Merrifield*, again for the reasons outlined above, there are multiple rational bases for the dual-license prohibition.

¶ 57    Because the dual-license prohibition is rationally related to the state's interest in maintaining public confidence and integrity in the video gaming industry and presents a reasonable method to achieve this goal, the circuit court properly dismissed counts I, II, and III of plaintiffs' amended complaint.

¶ 58                              2. The Profit-Splitting Requirement

¶ 59    Counts IV through VI all concerned the Gaming Act's profit-splitting requirement. This provision requires that, "[o]f the after-tax profits from a video gaming terminal, 50% shall be paid to the terminal operator and 50% shall be paid to the licensed establishment" notwithstanding any contrary agreement by the parties. 230 ILCS 40/25(c) (West 2016). A violation of this provision subjects the offender to a felony and termination of his license. *Id.*

¶ 60    According to plaintiffs, the profit-splitting requirement serves no purpose other than a wealth transfer from the licensed establishments to the licensed operators. According to plaintiffs, the requirement does nothing to combat a perception of corruption or bribery, and instead, the requirement prevents a fair negotiation over the profits from the joint enterprise.

- 28 -

Plaintiffs posit that, because establishments make the riskier investment in video gaming, the operators obtain a greater share of the profits generated from video gaming than they would have obtained through an arm's-length negotiation.

¶ 61    However, as noted by defendants, the profit-splitting requirement cannot be read in isolation but rather must be read in conjunction with another provision of section 25(c) of the Gaming Act (*id.*). Immediately before the sentence that requires profit splitting, the section states that "[n]o terminal operator may give anything of value, including but not limited to a loan or financing arrangement, to a licensed establishment *** as any incentive or inducement to locate video terminals in that establishment." *Id.* And plaintiffs have not challenged the constitutionality of the anti-inducement provision. Although there is apparently no legislative history discussing the rationale for the anti-inducement provision, it is likely the provision was intended to ensure that operators and establishments work more transparently and fairly with one another, and to prevent special favors and possibly bribery from entering their relationships. See *Ted Sharpenter*, 119 Ill. 2d at 175 (finding an anti-inducement provision of the Liquor Act intended to remedy competitive abuses in the alcohol industry). Had the legislature only prohibited operators from giving anything of value to establishments to host video gaming machines without the added profit-splitting requirement, operators could easily undercut this provision by having use agreements wherein they give a larger percentage of the after-tax profits to the establishments. This possibility demonstrates a conceivable purpose of the profit-splitting requirement, which acts as a complement to the anti-inducement provision. And thus, the profit-splitting requirement, when working in tandem with the anti-inducement provision, could help prevent unfair competition and corrupt practices. The requirement is therefore rationally related

to the State's interest in maintaining public confidence and integrity in the video gaming industry and presents a reasonable method to achieve this goal.

¶ 62    Additionally, as the circuit court found, the profit-splitting requirement is rationally related to public confidence and integrity in video gaming by attempting to prevent economic concentration in the operator sector, an issue with which our legislature was quite concerned. See 96th Ill. Gen. Assem., House Proceedings, October 30, 2009, at 12 (statements of Representative Lang) (asserting that "[i]t is not our desire to allow any 1 or 2 or 3 or 10 people to control the [operator] market"). If large, resource-heavy operators could negotiate more favorable profit-splitting arrangements with the establishments, it could create a race to the bottom where small, resource-barren operators cannot compete and are driven out of the market or refrain from entering the market. In this manner, the profit-splitting requirement helps remove a barrier to entry in the operator market. Thus, it is conceivable that our legislature required profit splitting as a means to prevent economic concentration in the operator industry and in turn, promote competition. As mentioned, the legislative history shows that economic concentration in the operator sector was an issue of concern, which is further borne out by section 25(i) of the Gaming Act (230 ILCS 40/25(i) (West 2016)), which directs the Board to consider "economic concentration" in determining whether to approve the operation of video gaming machines by an operator in a particular location.

¶ 63    Of course, the profit-splitting requirement may not be the most prudent means of preventing economic concentration in the operator industry. After all, as plaintiffs highlight, J&J Ventures Gaming, LLC, and Accel Entertainment Gaming, LLC, two of the intervening defendants in this lawsuit, control a significant portion of the operator market. In fact, as of May 2019, J&J Ventures Gaming, LLC, was linked to 1253 establishments while Accel Entertainment

Gaming, LLC, was linked to 1778 establishments. See *Licensed Establishments Linked to Terminal Operators*, Ill. Gaming Bd., http://www.igb.illinois.gov/VideoLists.aspx (last visited May 16, 2019) (data mirrored at https://perma.cc/RRU9-S2CS). In total, operators were linked to 7169 establishments, meaning together, J&J Ventures Gaming, LLC, and Accel Entertainment Gaming, LLC, comprise about 42% of the operator marketplace. *Id.* A 42% market share by two businesses may illustrate that the Board, the Gaming Act, the economics of the video gaming industry in Illinois, or some combination of all three, are not working efficiently to prevent economic concentration in that sector. But who is to say that, without the profit-splitting requirement, the market control by J&J Ventures Gaming, LLC, and Accel Entertainment Gaming, LLC, would not be greater.

¶ 64    If there are better ways to achieve the desired level of economic competition in the operator industry, that is an issue within the purview of the legislature to study and consider. As noted by plaintiffs, the Gaming Act initially contained a 5% hard cap on the market share of operators. See Pub. Act 96-34 (eff. July 13, 2009) (adding 230 ILCS 40/25(c)) ("No terminal operator may own or have a substantial interest in more than 5% of the video gaming terminals licensed in this State."). Our legislature removed that provision the following year (see Pub. Act 96-1410, § 5 (eff. July 30, 2010) (amending 230 ILCS 40/25(c))), after what plaintiffs claim was significantly lobbying efforts by the operator industry. While this cap may have been a better method at preventing economic concentration, as plaintiffs insinuate, legislative debates on removing the cap revealed that part of the impetus was due to the administrative burden on the Board in enforcing the 5% cap given the possibility of constant approvals, renewals, revocations, denials, etc. See 96th Ill. Gen. Assem., House Proceedings, October 30, 2009, at 11-12 (statements of Representative Fritchey). As video gaming did not become fully operational until

October 2012 (see *J&J Ventures Gaming*, 2016 IL 119870, ¶ 3), one representative even noted that, under a strict reading of the 5% hard cap, the very first operator to be licensed in Illinois would automatically be in violation of this provision by virtue of it holding 100% of the market share of the operator industry. See 96th Ill. Gen. Assem., House Proceedings, October 30, 2009, at 10 (statements of Representative Lang).

¶ 65    Instead of the administratively burdensome 5% cap, the legislative debates on removing this provision show that at least some legislators deemed a better way to combat economic concentration was giving the Board the authority to expressly regulate economic concentration using its judgment. See 96th Ill. Gen. Assem., House Proceedings, October 30, 2009, at 12-14 (statements of Representative Lang). Although never expressly mentioned in this debate about economic concentration, it is rational to think that the profit-splitting requirement could work in tandem with other provisions related to economic concentration to prevent dominance in the operator industry by only a select few operators. And therefore, the profit-splitting requirement is rationally related to the state's interest in maintaining public confidence and integrity in the video gaming industry and presents a reasonable method to achieve this goal.

¶ 66    Because the profit-splitting requirement is rationally related to the state's interest in maintaining public confidence and integrity in the video gaming industry, and a reasonable method to do so, the circuit court properly dismissed counts IV, V, and VI of plaintiffs' amended complaint.

¶ 67                                C. Counts VII Through XI

¶ 68    Plaintiffs lastly contend that their claims related to the policy document on inducements, advertising and promotions that the Board posted on its website were not moot, but even if they were moot, an exception applies.

¶ 69    An issue on appeal can become moot when intervening events have occurred that prevent the reviewing court from granting effectual relief (*In re Benny M.*, 2017 IL 120133, ¶ 17) or where there is no longer an active controversy (*In re J.T.*, 221 Ill. 2d 338, 349 (2006)). In other words, "[m]ootness occurs once the plaintiff has secured what he basically sought and a resolution of the issues could not have any practical effect on the existing controversy." *Hanna v. City of Chicago*, 382 Ill. App. 3d 672, 677 (2008). A reviewing court generally will not consider issues that are moot and will not issue advisory opinions. *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). Where an opinion does not "affect the result as to the parties or controversy in the case before it, a court should not resolve the question merely for the sake of setting a precedent to govern potential future cases." *In re Adoption of Walgreen*, 186 Ill. 2d 362, 365 (1999). "The mere voluntary cessation of allegedly wrongful conduct, however, cannot render a case moot, unless it becomes absolutely clear that such behavior could not reasonably be expected to recur," a burden the defendant bears. *Cohan v. Citicorp*, 266 Ill. App. 3d 626, 629 (1993). And even if an issue is moot, certain exceptions exist to allow the reviewing court to address the issue, such as the public interest exception or when the issue is capable of repetition yet evading review. *In re J.T.*, 221 Ill. 2d at 350. But before these exceptions become relevant, there must be a threshold showing of mootness. See *In re Benny M.*, 2017 IL 120133, ¶¶ 18-19. We review a dismissal based on mootness grounds *de novo*. *Hanna*, 382 Ill. App. 3d at 676-77.

¶ 70    Defendants assert that the issues concerning the policy document were rendered moot because the Board removed the policy document from its website and the Board has established by affidavit that it will not rely on the policy or repost it. Defendants note that the policy document was removed from the Board's website based on this court's decision in *Windy City Promotions, LLC v. Illinois Gaming Board*, 2017 IL App (3d) 150434.

¶ 71    In *Windy City*, as in this case, the Board posted a document to its website opining that certain promotional kiosks violated a section of the Gaming Act. *Id.* ¶ 1. The plaintiff filed a complaint seeking, among other things, a declaration that the Board lacked the authority to post the document to its website. *Id.* ¶ 4. During proceedings in the circuit court, another party was allowed to intervene as a plaintiff, and together, the plaintiffs also argued that the Board engaged in improper administrative rulemaking by posting the document to its website. *Id.* ¶¶ 7, 13. The circuit court, however, rejected the plaintiffs' claims regarding the Board's posting of the document to its website and granted the Board judgment on the pleadings. *Id.* ¶¶ 1, 13. The plaintiffs' subsequently appealed. *Id.* ¶ 14.

¶ 72    While the appeal was pending, the Board apparently removed the document from its website. *Id.* ¶ 19. As a result, the appellate court initially focused on whether the claims related to the document were moot. *Id.* ¶¶ 19-21. Although the court never expressly found that the claims were moot due to the Board removing the document from its website, the court implicitly found as such because it went on to discuss how an exception to the mootness doctrine applied. See *id.* ¶ 21. In doing so, the court found that, despite the Board removing the document from its website, the claims related to the document were capable of repetition yet evading review. *Id.* The court therefore rejected the Board's mootness argument. *Id.* In addressing the merits of the claims regarding the Board's authority to post the document on its website, the court concluded that the Board had the authority to attempt to adopt the policies contained in the document, but failed to follow the appropriate rulemaking procedures during its attempt. *Id.* ¶¶ 26-27. Consequently, the appellate court held that the attempted rule on promotional kiosks was invalid. *Id.* ¶ 28.

¶ 73　In this case, plaintiffs argue that we need not even determine if a mootness exception applies because their claims challenging the policy document are not moot in the first place. One of plaintiffs' arguments is that, because the Board is a state agency, its conduct could significantly change based upon an adverse ruling, meaning this court can still provide effective relief. To support this argument, plaintiffs rely on *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 367 (1992).

¶ 74　In that case, the Illinois Racing Board denied a racetrack's application for certain racing dates—the dates on which a racetrack could legally conduct horse racing—for the 1991 calendar year. *Id.* at 376-77, 382. The racetrack sued and challenged the Illinois Racing Board's denial. *Id.* at 383. Ultimately, the case ended up before our supreme court, by which time the 1991 calendar year had already passed and the issue of mootness was raised. *Id.* at 385-86. The racetrack argued that, despite its initial lawsuit seeking an award of 1991 racing dates, the propriety of the Illinois Racing Board's denial was not moot because its lawsuit also sought a determination that its procedural rights had been violated by the Illinois Racing Board. *Id.* at 386.

¶ 75　After reviewing the general principles of mootness, our supreme court noted that "there may be life in an appeal where a 'decision could have a direct impact on the rights and duties of the parties.' " *Id.* at 387 (quoting *People ex rel. Bernardi v. City of Highland Park*, 121 Ill. 2d 1, 6-7 (1988)). The court found that, had the racetrack's action concerned only the award of 1991 racing dates, the appeal would be moot. *Id.* But a decision in the case "regarding whether the [Illinois Racing] Board's procedures were inadequate to protect the rights of [the racetrack] and other racing participants could have 'important consequences' for all the parties involved." *Id.* And a ruling against the Illinois Racing Board could result in the agency "undergo[ing]

significant changes in the conduct of its race meetings." *Id.* at 387-88. Consequently, our supreme court found the appeal was not moot. *Id.* at 388.

¶ 76    Our supreme court expanded on the mootness principles of *Balmoral* in two subsequent decisions: *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52 (2006), and *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1 (1997). Initially in *Berlin*, 179 Ill. 2d at 4-5, the plaintiff, a doctor, had signed an employment contract containing a postemployment restrictive covenant with a nonprofit hospital to practice medicine. The doctor left the practice, began working at a medical clinic and sued the hospital seeking a declaration that the restrictive covenant was unenforceable. *Id.* at 5. Ultimately, the circuit court found the entire employment contract unenforceable because, by hiring the doctor to practice medicine as an employee, the hospital had violated the prohibition against corporations practicing medicine. *Id.* at 6. The hospital appealed, and by the time the case reached our supreme court, the time period protected by the restrictive covenant had already lapsed. *Id.* at 7. Addressing the possible mootness of the appeal, our supreme court found that its decision had important consequences for both parties. *Id.* at 8. If the court found that hospitals were barred from employing physicians, hospitals would have to significantly alter their relationships with medical staff, and such a finding could subject the hospital and the doctor to various penalties for violating the law. *Id.* Conversely, if the court found that hospitals were allowed to employ physicians, the hospital could have possible causes of action against the doctor based upon their contract. *Id.* Our supreme court therefore found that the appeal was not moot. *Id.*

¶ 77    In *Mohanty*, 225 Ill. 2d at 63-64, another case involving a restrictive covenant in a doctor's employment contract, our supreme court found the question of the restrictive covenant's enforceability was not moot despite the time period protected by the covenant already passing

because a resolution on its enforceability would directly impact the doctor's potential liability for damages based on a countercomplaint filed by the defendants.

¶ 78    Although the circumstances of the present case are unlike those in *Berlin* and *Mohanty*, this court's decision in *Filliung v. Adams*, 387 Ill. App. 3d 40 (2008), which relied on *Mohanty*, is instructive. There, two plaintiffs sued the Illinois Department of Human Services (IDHS) and three of its officials under multiple causes of action, all based on two written policies of a mental health center operated by the IDHS. *Id.* at 42-43. One count alleged that the health center improperly promulgated the policies in violation of the Administrative Procedure Act, while the remaining counts challenged the substance of the rules. *Id.* During the course of the litigation, a department-wide regulation issued by the IDHS superseded both the policies at issue. *Id.* at 44. On cross-motions for summary judgment, the circuit court dismissed the count related to alleged improper rulemaking, finding that the mental health center was not an agency for purposes of the Administrative Procedure Act and dismissed the remaining counts on the basis that they were mooted by the IDHS's department-wide regulation. *Id.* at 46-47. The plaintiffs appealed. *Id.* at 47.

¶ 79    On appeal, this court found all of the plaintiffs' counts related to the substance of the two written policies of the mental health center moot because of the superseding department-wide regulation. *Id.* at 55. However, the court found the count related to alleged improper rulemaking—the count that challenged the procedure by which the rules were promulgated at the health center—not moot. *Id.* Principally, and relying on *Mohanty*, the court found "the process which [the] plaintiffs challenged, namely the implementation by facilities of rules not promulgated according to the [Administrative Procedure Act], still continues, and thus still affects plaintiffs' rights and defendants' duties." *Id.* at 55-56. But regardless, the court found that

the public interest exception to the mootness doctrine would have been applicable. *Id.* at 56. Despite this count still presenting an active controversy, this court agreed with the circuit court that the mental health center was not an agency for purposes of the Administrative Procedure Act and, thus, found the count was properly dismissed. *Id.* at 55.

¶ 80 This case is similar to *Filliung*. Here, plaintiffs brought five counts related to the Board's policy document. While the majority of those counts related to the substance of the policy, counts VII and VIII related to the process by which the Board adopted the policy, *i.e.*, posting the document on its website and its statutory authority to enact such a policy. And thus, plaintiffs' challenge to the implementation of the policy and the Board's statutory authority to do so still remains and still affects their rights and the Board's duties. See *id.* at 55-56. Notably, in a January 2019 meeting, the Board approved for submission to the index department of the Illinois Secretary of State a proposed rule regarding inducements. See Ill. Gaming Bd., Regular Board Meeting (Jan. 30, 2019), https://www.igb.illinois.gov/FilesBoardMeeting/ 20190130VideoAudio.mp3 [https://perma.cc/8D8T-JC49]. This demonstrates that the Board's statutory authority to enact specific rules, regulations, or policies regarding inducements is still an active issue.

¶ 81 Moreover, an adverse ruling on plaintiffs' two counts undoubtedly could result in the Board undergoing significant changes in the way it conducts itself with regard to policies, guidance, rulemaking, etc. See *Balmoral*, 151 Ill. 2d at 387-88. Although the substance of the Board's policy document is no longer at issue because the Board removed the document from its website, the procedures leading up to that policy and the Board's authority to enact such a policy still remain in controversy. Additionally, a determination that the Board procedurally violated the Administrative Procedure Act by posting the policy document to its website or exceeded its

statutory authority in doing so would allow plaintiffs to pursue "reasonable expenses of the litigation, including reasonable attorney's fees." 5 ILCS 100/10-55(c) (West 2016); see also *Balmoral*, 151 Ill. 2d at 388 (noting that "a determination that the [Illinois Racing] Board violated [the racetrack's] rights through the procedure adopted could also have significant monetary consequences for the parties" because if the Illinois Racing Board violated the Administrative Procedure Act, the plaintiffs "may seek an award of costs and fees" under the Administrative Procedure Act). Consequently, counts VII and VIII are not moot because they challenged the procedures and authority utilized by the Board in enacting the policy document.

¶ 82    However, counts IX through XI challenged the substance of the policy document on grounds that the policy was arbitrary and capricious, the policy violated federal and state due process clauses, and the policy violated federal and state equal protection clauses, respectively. In particular, these three counts challenged the policy document's statements regarding how certain costs must be shared among operators and establishments. As such, these three counts challenged purely the substance of the policy document, rendering them moot. See *Filliung*, 387 Ill. App. 3d at 55. And this remains true despite count IX also requesting a declaration that the prohibition on inducements in section 25(c) of the Gaming Act (230 ILCS 40/25(c) (West 2016)) requires the guilty party to act with the purpose or intent to induce a licensed location to locate video gaming machines in its establishment because the underlying basis of that count was a challenge to the substance of the policy document. See *Filliung*, 387 Ill. App. 3d at 55.

¶ 83    Although counts IX through XI are moot, we cannot find the exception for issues that are capable of repetition yet evading review applies, as argued by plaintiffs. That exception requires the challenged action to "be too short in duration to be litigated fully prior to its cessation" and

there must be "a reasonable expectation that the same complaining party will be subject to the same action again." *In re Benny M.*, 2017 IL 120133, ¶¶ 19-20.

¶ 84    Plaintiffs posit that *Windy City*, 2017 IL App (3d) 150434, involved nearly identical circumstances to the present case, and we should likewise find the exception for issues that are capable of repetition yet evading review applicable. But in *Windy City*, the court found that the Board "could repost the Website Document," the specific document at issue in the appeal, "and thereby resurrect the *same* controversy." (Emphasis added.) *Id.* ¶ 21. Or, in other words, the second element necessary for the exception to apply was satisfied. In this case, however, the second element is not satisfied because of the affidavit from Ostrowski, wherein he averred that the Board would not repost or rely on the specific policy document again. His affidavit conclusively foreclosed any reliance by the Board on the specific policy document as a basis to take any action, and thus, there is no reasonable expectation that plaintiffs would be subjected to the same policy document again. See *In re Benny M.*, 2017 IL 120133, ¶ 20. As a result, unlike *Windy City*, the counts challenging the substance of the policy document itself are not capable of repetition yet evading review, and the circuit court properly dismissed them. Accordingly, while the circuit court properly dismissed counts IX through XI, we reverse its dismissal of counts VII and VIII and remand the matter to the circuit court for further proceedings on those counts.

¶ 85                                III. CONCLUSION

¶ 86    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County that dismissed counts I through VI and counts IX through XI, but reverse the court's judgment that dismissed counts VII and VIII. And we remand for further proceedings on those counts.

¶ 87    Affirmed in part and reversed in part; cause remanded.